## ELLIS–FOSTER CO. v. GILBERT SPRUANCE CO.
### No. 9545.

District Court, E. D. Pennsylvania.
May 19, 1939.

Alan N. Mann and William D. Burrows, both of New York City, and Howson & Howson, James D. Howson, and Dexter N. Shaw, all of Philadelphia, Pa., for plaintiff.

George F. Scull, Joseph V. Meigs, and Gifford, Scull & Burgess, all of New York City, and Clinton W. Frontz, of Philadelphia, Pa., for defendant.

KIRKPATRICK, District Judge.

This is a suit for infringement of U. S. Reissue Patent No. 19,967 to Weber. The original patent was applied for in 1922, was issued in 1929, and reissued in 1936.

The only claim in suit is claim 11, which is as follows: "A varnish consisting of a solution of a glycerol ester of a resin and organic carboxylic acid selected from the group consisting of phthalic, maleic fumaric, malic and succinic acids, incorporated with nitrocellulose."

The composition claimed is properly a lacquer. The term varnish was formerly applied to all liquid wood-finishers, but today the quick-drying types are usually called lacquers. They are applied by spraying, and are particularly useful in finishing wooden articles manufactured in large quantities, such as furniture, radio cabinets, and the like. In appearance they are not distinguishable from oil or spirit varnishes except by an expert. Certain types of lacquers are also used for metal finishing, but the claim in suit describes a wood lacquer.

Infringement is not seriously disputed. There is no evidence of anticipation, and the only substantial issue is that of invention.

The patent is for a combination of nitrocellulose and a particularly described synthetic resin, in an unspecified solvent. The synthetic resin which is described in the patent as a "glycerol ester of a resin and organic carboxylic acid selected from the group consisting of phthalic * * * acids" is a three-element chemical combination, consisting of natural resin, phthalic acid and glycerine reacted together. It is generally referred to as the R. P. G. resin, the letters signifying rosin, phthalic acid and glycerol. The propor-

tions are not stated, but in practice two and a half parts of the resin are combined with one part of nitrocellulose.

The nitrocellulose gives toughness and durability to the film. The resin makes it adhere to the wood, imparts the proper luster, and keeps it sufficiently hard and brittle to allow for the usual finishing process which consists of rubbing with sand paper or pumice. It also has another function. Nitrocellulose of sufficiently low viscosity to be sprayed is so thin that two or three coats must be applied in order to get a suitable finish. The resin, without greatly increasing the viscosity of the fluid, imports enough solids into it to produce a satisfactory film upon the wood at a single spraying.

Several early patents (e. g. Fairfax, British, of 1890) say that nitrocellulose can be combined with a resin to make a varnish, and point out the toughening effect of the nitrocellulose in the product. The Fairfax patent seems to contemplate the use of the natural resins only (shellac, resin, copal, sandarac), but there were also suggestions to be found in the art to the effect that synthetic resins may be used, and it is undoubtedly the fact that experts were generally aware of the possibility of making a satisfactory lacquer by combining nitrocellulose with either a natural or a synthetic resin, provided the right resin could be found. In addition to having other necessary qualities, the resin must be miscible with nitrocellulose in a common solvent and should be compatible with it in as widely varying proportions as possible. Compatibility is the quality of "staying put" in the resultant liquid. In combinations with nitrocellulose, many resins will tend to separate, or there may be a precipitate, which spoils the film. Of course, with almost any resin, the presence of a very small amount of nitrocellulose will not usually produce such undesirable effects but unless it can be used largely enough to form the practical base of the composition it will not do much good.

Now it is the fact that the resin element of claim 11 was fully disclosed in the specification of a prior patent (No. 1,098,776 to Arsem, issued in 1914), although the claims of that patent are primarily directed to a resin composed of *two* polybasic acids (e. g. phthalic and succinic) with glycerol. The principal disclosure of the Arsem patent was an inter--

action by means of which a known, hard, insoluble, synthetic resin of a still earlier art (Watson Smith resin), composed of phthalic acid and glycerol, could be made soluble and commercially available by means of the addition of a third substance. The resin which goes into the lacquer of claim 11 of the patent contains phthalic acid and glycerol in combination, but its third substance is not an acid but a natural resin—ordinary rosin—a substance not strictly an acid, but having acid properties.

However, whatever the scope of the claims of the Arsem patent, the specification points out that, "Various substances not strictly acids but having acid properties may be employed"—for the third substance—"For example, 240 parts of the glyceryl phthalate may be acted upon by 279 parts of colophony, an acid anhydrid, to form a hard, reddish-brown resin which is not the equivalent of a simple mixture of phthalic resin and colophony." Colophony is another name for the rosin of the patent in suit.

At the beginning of the specification, the Arsem patent says that its resin is "suitable for the production of molded articles, electrical insulation, varnishes, etc." It is not improbable that the varnish which Arsem had in mind is, as the plaintiff suggests, a type of varnish used for insulation where the material is applied in liquid form and hardened in situ by subsequent baking to render it permanently insoluble. Arsem was a General Electric man, and there is nothing to show that he was in the least interested in wood finishing. At any rate, there is no suggestion in the Arsem patent of combining the resin claimed or that described in the specification with nitrocellulose for any purpose whatever.

The fact remains, however, that the synthetic resin described in the Arsem specification is what Weber used as one ingredient of his lacquer, and we must assume that he got it from the Arsem patent. Thus the question is whether it was invention to take this particular synthetic resin from the hundreds, perhaps thousands, known and used for all manner of purposes and show that it will combine with nitrocellulose to make a commercially suitable lacquer.

The defendant, conceding that the combination is not anticipated, contends that the substitution of the Arsem resin (say for the shellac) in the nitrocellulose lacquer of the Fairfax patent, is mere routine laboratory procedure, and is what ordinarily takes place in any case where, by reason of industrial developments, the production of a particular material becomes commercially advantageous.

In the case of lacquers or varnishes, the art, while it recognized the possibility of nitrocellulose combinations and the advantages to be derived from the use of that substance, had made very little advance in that direction prior to 1922, principally because the high viscosity nitrocellulose of commerce was not practically usable. The defendant points out that nitrocellulose lacquers were given a tremendous impetus by the invention and marketing of low viscosity nitrocellulose, which occurred between 1921 and 1923. New solvents became cheap and plentiful (beginning about 1919) as a result of unused war stocks. At about the same time (also a postwar development) the price of phthalic acid was greatly decreased, so that the manufacture of resins derived from it became practicable. Thus, commercial barriers which had stood in the way of advances in the lacquer art were swept away shortly before or just about the date of Weber's application.

I accept the facts as stated. Obviously, no one would be very greatly interested in producing the article of the patent, or any other article for that matter, until it became commercially practicable; and it may also be true that, with the knowledge which the art had, it would have been evolved sooner or later, whether from the plaintiff's laboratory or someone's else.

All this does not necessarily negative invention. Industrial progress, the beginning of new commercial demands, the development of new materials and the cheapening of old ones, have furnished the stimulus for many an invention, some very great ones. Some, no doubt, are the outcome of mere chance, others of unprompted research, conducted without immediate hope of commercial utility, but most bide their time until a changing world calls them into being, or at least is ready to receive them. Nor must invention be ruled out, merely because the desired result has been arrived at by recognized research-laboratory procedure. There is no reason why guess work should be rewarded and orderly and scientific processes penalized.

That the substitution of one known material for another in a known combination may amount to invention, depending upon whether the step went beyond what was obvious to persons skilled in the art, is too well settled to require citation of authority. Of course, if the result is so entirely predictable that it lies within the knowledge of ordinarily skilled workers in the field, it will not be an inventive step. This was the main fact issue in the case, to which most of the testimony was directed. The defendant's contention was that the lacquers composed of nitrocellulose and resin are not chemical combinations, but mechanical mixtures, and that the characteristics of any particular resin which may be chosen will be carried over into the product substantially unaltered. The effect of the adoption of any particular element is therefore, the defendant says, purely additive.

Naturally, if the laboratory worker was interested in producing a lacquer in which some desired quality was to be emphasized, he would begin with a resin which had that characteristic most highly developed, determine its miscibility in the available solvents and its compatibility with nitrocellulose, and then make tests of the final product to see whether he had obtained what he wanted; but the evidence of the protracted and fruitless experimenting in the research laboratory of the Atlas Powder Company demonstrates that it was not nearly as easy to get a satisfactory result as the defendant suggests. That was exactly what the workers in that department did, and they were never able to work out anything which was commercially usable. Within broad limits, the result of the introduction of a particular resin in a lacquer is predictable, but not, in my judgment, so much so that all its characteristics would lie within the knowledge of the ordinarily skilled research man. Whether the lacquer of the patent is a mere mechanical mixture or whether, as Dr. Esselen put it, "there is a loose form of chemical combination that takes place," there are results, particularly relating to the range of compatibility of the resin and the nitrocellulose, which are not to be predicted. The problem of producing a suitable lacquer for a particular purpose is not one which can be worked out on paper. It is my finding that, as it concerns this case, it is beyond the range of routine laboratory work and requires the exercise of the inventive faculty.

The Arsem patent was cited against Weber in the Patent Office, and I can not agree with the defendant that there is anything in the file wrapper arguments which impairs the presumption of validity arising from the grant. The last action of the Examiner and his statement to the Commissioner of Patents on appeal show that he had not been in the least misled by anything which the applicant may have urged upon him. He consistently rejected claims for the combination of nitrocellulose with various broadly described classes of synthetic resins, but he readily allowed over Arsem a combination with the specific resin finally claimed. Most of the controversy arose because of the applicant's persistance in pressing his original broad claims. The Examiner understood fully that combinations of nitrocellulose and synthetic resins had been produced prior to the Weber application, "with some degree of success," but he found that the applicant disclosed a combination "somewhat more successful than the best of the prior art, in a field where the combination of even fairly similar resins with nitrocellulose is not predictable." If to this statement is added the testimony of Dr. Esselen (which I have found to be the fact) that, "The outstanding feature is the fact that although the resin described is a very hard one which imparts toughness to the film, nevertheless, contrary to the previous experience in this industry, it has a very wide range of compatibility with nitrocellulose," you have a concise statement of the case for patentability.

Claim 11 is held valid and infringed. It seems hardly necessary to make separate findings of fact. The only issue really involved is that of invention, and upon this I have found for the plaintiff. I also find infringement. As to the other facts, there is little if any dispute. The statements of fact contained in the foregoing opinion may be taken as special findings.

If, however, the parties deem that separate findings are needed, requests may be presented.

The final conclusion of law is that the plaintiff is entitled to the relief prayed for.

Judgment accordingly.