## GILBERT SPRUANCE CO. v. ELLIS-FOSTER CO.

### No. 7249.

Circuit Court of Appeals, Third Circuit.

Sept. 11, 1940.

Alan N. Mann and William D. Burrows, both of New York City, and Howson & Howson, of Philadelphia, Pa., for plaintiff-appellee.

Clinton W. Frontz, of Philadelphia, Pa. (George F. Scull and Joseph V. Meigs, both of New York City, of counsel), for defendant-appellant.

Before BIGGS, CLARK, and BUFFINGTON, Circuit Judges.

BIGGS, Circuit Judge.

Claim 11 of United States Reissue Patent No. 19,967 for "Composition of Matter Comprising Resin Esters" reissued May 12, 1936, to the appellee, Ellis-Foster Company, as assignee of Harry M. Weber, is alleged to be infringed by the Gilbert Spruance Company, the appellant, in the suit at bar. Specifically the claim is for "A varnish consisting of a solution of a glycerol ester of a resin and organic carboxylic acid selected from the group consisting of phthalic, maleic, fumaric, malic and succinic acids, incorporated with nitrocellulose."

Weber's disclosure is as follows. Briefly reciting that the object of his invention is to provide a composition which has qualities of toughness, flexibility, extensibility and the like, he points out that ordinary rosin ester or ester gum is a brittle substance with limited solubility. He then states, "If, however, a non-resinous organic acid such as phthalic acid is allowed to esterify with glycerine in conjunction with rosin, a valuable product is obtained which may be termed a rosin phthalic ester of glycerol or a rosin phthalic glyceride resin." He goes on to say that it is well known that nitrocellulose is incompatible with many substances and that most of the resins which dissolve in solvents for nitrocellulose are not miscible with nitrocellulose and that therefore when a solution containing any substantial amount of nitrocellulose with resin dries, the resin and the nitrocellulose separate out into a worthless and unhomogeneous mass. Weber then states, and this is the gist of his disclosure, "I have found that the rosin phthalic glyceride resin will dissolve, mix or blend with nitrocellulose and apparently in almost any proportion. Hence it becomes possible to introduce nitrocellulose * * * to serve as a toughening agent."

Weber's claim and specifications describe a varnish of the type known as a nitrocellulose lacquer. Spirit varnishes, solutions of resin in volatile solvents, had been used to coat wood to prepare its surface for finishing. Oil varnishes, consisting of oils and resins in solution, had been employed for like purposes. Nitrocellulose lacquers, however, consist of resins mixed with nitrocellulose in volatile solvents and are quick drying. The solvents evaporate leaving a solid residue on the surfaces coated, consisting of resin and nitrocellulose in some sort of colloidal affinity or sus-

pension. The nitrocellulose imparts a toughness and flexibility to lacquers not otherwise obtainable. This is particularly desirable if the lacquer is to be used for finishing wood where toughness and hardness in the finishing surface or film is most desirable. The difficulty which the art had encountered in making such lacquers was that nitrocellulose and the hard resins ordinarily do not mix well and no method or formula had been found which made them sufficiently miscible. This is not to say that prior to the disclosure of the patent in suit there had been no nitrocellulose lacquers; viz., solutions of nitrocellulose with resins, designed and intended for finishing wood surfaces. For example, in Fairfax' British Patent, No. 12,684, issued in 1891, the patentee gives a formula for a varnish consisting of pyroxylin (cellulose nitrates) and shellac (purified resin), dissolved in acetate. This is a nitrocellulose lacquer. The art, however, did not seem to be able to produce lacquers capable of satisfactory commercial performance in finishing woods. It was believed, and not unreasonably, that the harder the resin, the harder would be the lacquer, but this belief when applied in practice did not solve the problem of how to get a lacquer which would serve as a sanding sealer, that is to say, a lacquer which when sprayed on a wood surface could be subjected to the pressure of hard rubbing with sandpaper without disintegrating so that additional finishing coats might be added immediately.

Atlas Powder Company, one of the largest manufacturers of lacquers in the United States, as far back as the latter part of 1919 had endeavored to find a nitrocellulose lacquer suitable for use as sanding sealer for wood surfaces. It employed an experimental staff for that purpose over a long period. The research chemists thus employed reported that solutions consisting, for example, of Dammar, a resin well down Ande's scale of hardness, and nitrocellulose, did not possess satisfactory sanding characteristics "* * * as the material heated under the sandpaper, softened and then filled up the paper with resin." They concluded that it would be necessary to incorporate a harder resin with the Dammar or replace the Dammar with a hard resin in order to obviate this difficulty. The Atlas chemists then found that when really hard resins were mixed with nitrocellulose in solution, such solutions were turbid and discolored because of imperfect miscibility and affinity which tended to render them commercially useless. These difficulties framed the problem of the art prior to Weber's disclosures.

Before dealing further with the patent in issue, it is necessary at this point to refer to Arsem's United States Patent No. 1,098,776, issued to General Electric Company upon June 2, 1914, for resinous condensation products, which are plastic compositions, and a process for making them. Arsem's patent is for a new synthetic resin. His specifications direct themselves principally to the mixing of phthalic and succinic acids with glycerol. The specifications call first for the mixing of glycerol with phthalic anhydrid, forming an ester with free hydroxyl, then adding succinic acid to the mass which after further treatment forms resin. Arsem states that the composition thus formed is, in his opinion, a glycerol ester of phthalic and succinic acids having a cyclic structure with intermediate products. He states also that his process is suitable for the production of moulded articles, electrical insulation and varnishes. The varnishes which Arsem referred to in his patent presumably are not nitrocellulose lacquers for he was employed by the General Electric Company and such lacquers would fall outside the field of his employer's primary interests.

What is of great importance in the Arsem patent in so far as the case at bar is concerned occurs near the end of Arsem's specifications. Arsem states, "Various substances not strictly acids but having acid properties may be employed. For example, 240 parts of the glyceryl phthalate may be acted upon by 279 parts of colophony, an acid anhydrid, to form a hard, reddishbrown resin which is not the equivalent of a simple mixture of phthalic resin and colophony." If phthalic acid and glycerol are reacted completely with one another, a synthetic resin, well known to the art, Watson Smith resin, really glycerol phthalate, is formed. Arsem points out, seemingly quite incidentally to the main disclosures of his patent, that if glycerol phthalate, Watson Smith resin, is mixed with colophony, which is simply natural resin, in proportions which he indicates, a new synthetic resin results, which is not the equivalent of a simple mixture of phthalic resin and colophony because a kind of colloidal reaction takes place to form a new product. The point, however, is that this synthetic resin is in fact the "rosin phthalic ester of glyc-

erol" or the "rosin phthalic glyceride resin" of Weber's patent. It is the synthetic resin which Weber discloses will mix or blend with nitrocellulose to create a nitrocellulose lacquer suitable for sanding sealer or other coating for wood surfaces. It is hard enough and tough enough. Its viscosity is such that it adheres readily to wood, but that viscosity is not too great to prevent its ready application by spraying. It is of high commercial value.

The next question for our determination is whether Weber disclosed and claimed this product in his original application. The appellee contends that by the reissue Weber has in effect broadened his claims. Weber's original application did not restrict itself to the organic acids named in claim 11 of the patent. Weber stated: "The acids preferably employed [for esterification of glycerine] are polybasic aliphatic acids such as maleic, fumaric, succinic, malic, citric, tartaric acids and the like, or aromatic acids of a dibasic character of which phthalic acid is an example." This statement in fact includes acids which when used as a means of esterification would scarcely produce an acceptable glyceride to be mixed with nitrocellulose for the purposes of the patent. He has stricken certain polybasic acids out of his original application. In that application, however, Weber laid emphasis upon the use of phthalic acid and because of this we can perceive no reason why he was not entitled to narrow his claims as he has done. The reissue therefore narrowed the patent and did not broaden it. The reissue contains nothing which was not contained in and disclosed by the original application. Claim 11 is for the "same invention" as that disclosed in the original application. We conclude therefore that Weber did adequately disclose the nitrocellulose lacquer which he claims as his discovery. See Walker on Patents, Deller's Edition, Vol. 2, Sec. 182, and the authorities therein cited.

The appellant also contends that the learned District Judge credited Weber with something that he did not disclose because Weber does not describe the synthetic resin of his application as a hard resin or specify conditions which will produce hard-ness. We think that the appellant misunderstands what the court below said in this connection. The learned District Judge accepted the testimony of Dr. Esselen who stated that the resin described by Weber was a very hard one, giving toughness to the film (a thing to be expected), but also one which contrary to previous experience in the field had a wide range of compatibility with nitrocellulose. Dr. Esselen did not mean that Weber described the resin of his patent as a "hard" resin. He meant that Weber designated a resin which is a hard one. This contention of the appellant must fall.

We come therefore to the final question. Has Weber demonstrated inventive genius? The appellant contends that he did not, that Arsem gave him the resin and that all that Weber did was fit it mechanically into a well-established art, that had the Atlas chemists known of Arsem's resin they could and would have solved the problem of nitrocellulose lacquers by their experiments at Stamford. Arsem's patent issued on June 2, 1914, and its disclosure was as available to the Atlas Company as it was to Weber. We must assume that Weber's synthetic resin did come from Arsem's patent, but there are very many natural resins and many synthetic resins and out of this great number Weber had to pick and did pick the suitable resin. It is true that it was a "hard" resin. Arsem so described it. It is equally true that the art had supposed that hard resins would give hard lacquer, but as the chemists employed by Atlas pointed out and as the art knew, the harder the resin the less the compatibility with nitrocellulose. In the light of the foregoing we think that Weber did demonstrate inventive genius, that he seized upon a thing which was available to all but which had been grasped by none, and was able to fit it into a new place, to create an original and useful result. We conclude that this was not the exercise of mere mechanical ingenuity or a step in the natural development of an art, but was in fact invention. The case at bar presents an almost classic example of a new use.

Accordingly, the judgment of the court below is affirmed.