John W. BENTLEY, Appellant,

v.

SUNSET HOUSE DISTRIBUTING CORP., etc., Appellee.

No. 19453.

United States Court of Appeals Ninth Circuit.

March 25, 1966.

---

William A. Kemmel, Jr., Los Angeles, Cal., for appellant.

Freeman & Blum, Ivon B. Blum, Beverly Hills, Cal., for appellee.

Before BARNES, JERTBERG and DUNIWAY, Circuit Judges.

DUNIWAY, Circuit Judge:

Bentley brought this action for unfair competition and for patent infringement under 35 U.S.C. § 281, asking treble damages, costs, and attorney's fees. The jury returned a general verdict for Bentley, assessing his damages at $4,581.60. The court granted defendant Sunset House's motion for judgment notwithstanding the verdict (Rule 50(c), F.R.Civ.P.), and also granted, conditionally, its motion for a new trial. Bentley appeals.

A model of the patented device, a meatball mold, was first made some time in 1956. As finally refined, it is a scissorlike instrument whose two handles, affixed together at about midpoint with a rivet, terminate at the other end in facing hemispherical cups which close together to make a sphere. The edges of the cups taper to a cutting edge. Each handle is attached to the outer wall of its cup at about midpoint between edge and apex to avoid a build-up of meat between the handles and to make cleaning easier. In order that the meatball will be firm enough to hold together throughout the cooking and serving process, yet not so firm as to be difficult to eat, a hole is cut in the apex of each cup, of a size that allows the escape during compression of just the right quantity of excess meat and of air. Additionally this hole lets air back in when the cups are opened, easing removal of the finished meatball from the molds by eliminating suction.

Bentley saw commercial possibilities in his device, and, in the summer of 1957 instructed his attorney to file an application for a mechanical patent. That fall he investigated with domestic manufacturers the cost of mass production of the device. He found the cost prohibitively high, and got in touch with three importers to determine the cost of Japanese manufacture. One quoted too high a cost and another wanted too high a royalty. The third, Westwood Import Company, responded to Bentley's inquiry after his application for a mechanical patent was finally filed on January 10, 1958. (He applied for a design patent on February 19, 1959.)

In November of 1958, while license negotiations were in progress, Bentley suggested to Westwood that procuring a Japanese patent would prevent unauthorized production of the mold in that country, and was informed that Westwood had caused an application for a Japanese patent (later discovered to be a design patent) to be filed some "six or seven months" before. In December, 1958, Bentley granted Westwood an exclusive license to import and sell the molds, in consideration of a royalty. This arrangement was terminated in early 1960 after Westwood discovered that closely similar or identical molds were being sold by two other importers. Bentley realized a total royalty from Westwood of $32.01 from sales by that company over a 13-month period.

Upon the issue of Bentley's patents— U. S. Design Patent No. 187,748, issued April 26, 1960, and U. S. Patent No. 2,957,199, issued October 25, 1960, which we sometimes refer to hereafter as the "design patent" and the "mechanical patent," respectively—he personally experimented with import and promotion of the mold, making his first public distribution of patent-numbered molds on March 17, 1961. Sunset House commenced advertising and sale of identical, unmarked molds the following month, and was

notified of Bentley's patent and claim of infringment in a letter received May 9, 1961. Sunset House continued to sell the mold, and by mid-November, 1963, had sold about 45,000 units.

On appeal, Bentley claims in substance that the court below erred:

(1) in granting the motions for judgment n. o. v. and for a new trial;

(2) in holding his mechanical patent invalid;

(3) in holding his design patent invalid;

(4) in holding that Sunset House did not compete unfairly with Bentley with respect to the mold or advertising matter, and

(5) in awarding costs of suit to Sunset House.

1. *Judgment notwithstanding the verdict.*

Bentley asserts that the district court's grant of judgment n. o. v. effectively deprives him of the jury trial to which the Constitution entitles him.

The appropriate accommodation of the constitutional guarantee of jury trial and the necessity of ensuring that the constitutional and statutory standards of patentability are met in particular cases has been a subject of much debate and exploration in the cases. But we think that debate was foreclosed by Graham v. John Deere Co., 86 S.Ct. 684, decided February 21, 1966. There it was held that "the ultimate question of patent validity is one of law." This, in substance, has long been the position of this court, as Judge Pope noted in his concurring opinion in Bergman v. Aluminum Lock Shingle Corp., 9 Cir., 1957, 251 F.2d 801, 809–813. See e. g., Griffith Rubber Mills v. Hoffar, 9 Cir., 1963, 313 F.2d 1. It is the position adopted by other circuits, see e. g., Hygienic Specialties Co. v. H. G. Salzman, Inc., 2 Cir., 1962, 302 F.2d 614, 617, n. 6; Packwood v. Briggs & Stratton Corp., 3 Cir., 1952, 195 F.2d 971, 973; Monroe Auto Equip. Co. v. Heckethorne Mfg. & Supply Co., 6 Cir., 1964, 332 F.2d 406, 412. If the pat-

ents are invalid as a matter of law, the court not only had the power, but it was its duty, to grant the motion for judgment n. o. v. Himes v. Chadwick, 9 Cir., 1952, 199 F.2d 100; Packwood v. Briggs & Stratton Corp., supra; see Griffith Rubber Mills v. Hoffar, supra; Berkeley Pump Co. v. Jacuzzi Bros., Inc., 9 Cir., 1954, 214 F.2d 785.

2. *Validity of the mechanical patent.*

The basic standard of patentability is established by Art. I, § 8, cl. 8 of the Constitution, Graham v. John Deere Co., supra. It is particularized in 35 U.S.C. §§ 101–103, which define the three basic requirements of novelty, utility, and non-obviousness. It may be conceded *arguendo* that the mold here in suit is novel and useful. But is it "non-obvious"? Section 103 provides:

"§ 103. *Conditions for patentability; non-obvious subject matter.*

"A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made."

Whether a patent meets the standard of non-obviousness enunciated in § 103 depends upon the resolution of

"several basic factual inquiries. Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., * * *

may have relevancy." Graham v. John Deere Co., supra.

We are told that these requirements are to be strictly observed and are reminded that, while the 1952 revision of § 103 does not change the requisite standard of innovation originally embraced in Hotchkiss v. Greenwood, 1850, 52 U.S. (11 How.) 248, 13 L.Ed. 683,

> "technology * * * has advanced—and with remarkable rapidity in the last 50 years. Moreover, the ambit of applicable art in given fields of science has widened by disciplines unheard of a half-century ago. It is but an even-handed application to require those persons granted the benefit of a patent monopoly be charged with an awareness of these changed conditions. The same is true of the less technical, but still useful arts. He who seeks to build a better mousetrap today has a long path to tread before reaching the Patent Office." Ibid.

With the foregoing in mind, we examine the mechanical patent in suit, considering the key characteristics of prior art patents cited when it was prosecuted in the Patent Office.

*The Prior Art.*

In prosecuting his claim through the patent office, Bentley relied upon five patent references, Allen (1865, #46,319), May (1873, #141,882), Whitman (1927, #1,639,122), Little (1936, Des. #100,-705), and Dirks (1910, Germany, #218,-836), and referred to Jackson (1935, #2,-003,197) and Wosse (1957, #2,785,641) to show the state of the art. At trial, Landstra (1924 #1,515,125), Wiatt-Pickering (1890, #436,818), and Dow (1926, #1,584,757) were cited as well.

Without going into detail, we think that the following is a fair summary of the relevant disclosures in these patents, all but one of which covers a food mold. Opposing half molds of various shapes, most frequently hemispheres, appear in all of them. Scissor handles (or their analogues, plier handles) are found in six, vents in two and vent substitutes in another two, cutting edges in two and scooping edges in two. The question becomes whether these characteristics are sufficiently different from those embodied in Bentley's device to make it patentable.

*The Obviousness of the Differences.*

All of the elements of Bentley's mold appear in two or more examples of the prior art. He himself testified that he did not claim total originality as to any single aspect of his device. The most strikingly different features of his mold are (1) its peculiar combination of ingredients and (2) the size and placement of the vents.

In assessing the patentability of combination patents, we are to apply a "severe test," whether "the whole in some way exceeds the sum of its parts" to produce "unusual or surprising consequences from the unification of the elements * * *," Great A. & P. Tea Co. v. Supermarket Equipment Co., 1950, 340 U.S. 147, at 152, 71 S.Ct. 127, at 130, 95 L.Ed. 162. But that unification here produces only the obvious. Meat molds had previously been produced; the only unusual feature in this combination is its vents. Vents had been used for similar purposes in other food molds, and their use in this meatball mold is no more ingenious than would be expected of "a person having ordinary skill in the art," 35 U.S.C. § 103. We do not regard this combination to be less obvious than many which we have previously held unpatentable, see, e. g., Monroe Auto Equip. Co. v. Superior Indus., Inc., 9 Cir. 1964, 332 F. 2d 473, 482 n. 13 and cases there cited; Pressteel Co. v. Halo Lighting Prods., Inc., 9 Cir. 1963, 314 F.2d 695, 698; see also Troy Co. v. Products Research Co., 9 Cir. 1964, 339 F.2d 364, 368 (dissenting opinion.).

Nor is the vent itself patentable. At most, it is of a particular size, placed in a different position in the mold; this shift itself produces nothing startlingly new in functional efficiency. We think our holding in Bergman v. Aluminum Lock Shingle Corp., 9 Cir. 1957, 251 F.2d 801, 809, appropriate here: "The drain slot

forms the basis of this invention. * * In other words, his product is built upon a foundation even less substantial than sand. It is constructed upon a slot—in other words, upon a hole. Such a patent cannot stand. At most, it 'is merely a mincing step forward.'"

■ When the combination is as clearly non-patentable as this one is, other factors on which Bentley relies cannot make it patentable. These are commercial success, which is not impressive in this case,[1] copying,[2] and claimed satisfaction of a long-felt need.[3]

The court below was clearly justified in setting aside the jury's verdict as to the mechanical patent.[4]

### 3. *The design patent.*

■ In appearance, appellant's mold is an implement approximately seven inches long, terminating at one end in finger loops which, when the mold is closed, form a roughly circular figure 2½ inches in diameter. The hemispherical molds at the other end form, when closed, a sphere about 2 inches in diameter. Midway between the ends the individual handles are broadened to a circular shape where the rivet connects them. The net effect, according to Bentley, is one of smooth-flow-

ing lines and a pleasingly balanced construction of sufficient aesthetic merit to be deserving of a design patent.[5] The Patent Office[6] thought the design patentable and the jury agreed. We do not.

■ Where the "design" of a design patent is dictated primarily by functional or mechanical requirements and any pleasing aesthetic effect is only an inadvertent by-product, the design patent is invalid. E. g., Bliss v. Gotham Indus., Inc., 9 Cir., 1963, 316 F.2d 848, 850–851. Bentley, on cross-examination, testified specifically that his primary purpose in constructing the mold as he did was "To devise a tool that would make meatballs." The balance of his testimony supports the conclusion that each part of the device was designed solely or principally to suit a specific functional purpose, and that any pleasing aesthetic effect was a minor windfall. We note, moreover, that the design patent application was not filed until more than a year after Bentley applied for the mechanical patent.

■ While these factors are not conclusive, they are consistent with our conclusion that the device itself "is not ornamental and does not appeal to the eye as a thing of beauty; does not relate

1. Westwood cancelled its licensing agreement upon its claim that it was having difficulty in even recovering its costs. Bentley's own success in attempting to market the mold was minimal. Sunset House, despite extensive advertising of the item in newspapers and magazines and in its own circular, distributed eight times per year to a mailing list of over two million addressees, managed to sell only 45,000 over a 30-month period. And at the time of trial only 13 firms (other than defendant) in the entire country were shown to be selling the item. This is anything but overwhelming evidence of pent-up consumer demand. Cf. Jaybee Mfg. Corp. v. Ajax Hardware Mfg. Corp., 9 Cir., 1961, 287 F.2d 228, 230.

2. Here the evidence at most establishes that defendant purchased molds from a source of existing supply (Westwood), not that it had any part in the copying. Cf. William T. Alvarado Sales Co. v. Rubaloff, 9 Cir., 1959, 263 F.2d 926, 930.

3. The fact that the patentee's device satisfies long-felt needs is persuasive proof

of innovation, Graham v. John Deere, Co., supra, 84 S.Ct. 684; Kaakinen v. Peelers Co., 9 Cir., 1962, 301 F.2d 170, 173. But the limited sales in this case show no such long-felt need.

4. We find it unnecessary, in view of this holding, to consider defendant's claims that plaintiff is barred from suit by laches and estoppel, and that his patent is unenforceable for "double patenting."

5. 35 U.S.C. § 171:
"Whoever invents any new, original and ornamental design for an article of manufacture may obtain a patent therefor, subject to the conditions and requirements of this title.
"The provisions of this title relating to patents for inventions shall apply to patents for designs, except as otherwise provided."

6. The initial examiners originally rejected all claims for both design and mechanical patents.

more to appearance and to matters of ornament than to utility and does not appeal to the aesthetic emotion." Bliss v. Gotham Indus., Inc., supra, at 851. The law does not require that the device be attractive to us; judges are part of the laity insofar as artistic judgment is concerned. But we must be able to find the design to be the result of invention, not modification, and to be ornamental, "the product of aesthetic skill and artistic conception." Hygienic Specialties Co. v. H. G. Salzman, Inc., 2 Cir., 1962, 302 F.2d 614, 617–18 and cases there cited. Here we find only modification; two molds in the prior art had finger-loop scissor handles, three had spherical molds, and at least five had a rather circular thickening of the handles where they were joined together. Almost all had horizontal lines, when closed and lying flat, of the degree of straightness which Bentley says is attractive. The "balance" between handle and mold or tongs on many is roughly the same as that of the Bentley mold. Alone, then, or in the aggregate, the features of this tool show no invention. Nor do they show ornamentation; as indicated above, each feature was designed to be and is unabashedly and purely functional.

 The alleged commercial success of the device and copying of it by defendant do not suffice to save the patent, for the reasons discussed above. Nor does the presumption of validity created by the action of the Patent Office. That presumption in any case "has been in re-

cent years almost reduced to nullity in patent cases." Jacuzzi Bros., Inc. v. Berkeley Pump Co., 9 Cir., 1951, 191 F.2d 632, 634–635. Moreover, the file wrapper does not show that the Patent Office considered Allen, Dow, or May, prior art references cited in the prosecution of the mechanical patent whose structures are in many respects clearly as similar to Bentley's mold as were the actual references. Consequently, whatever remains of the presumption is largely or entirely dissipated, e. g., Pressteel Co. v. Halo Lighting Prods., Inc., 9 Cir., 1963, 314 F.2d 695, 697; Jaybee Mfg. Corp. v. Ajax Hardware Mfg. Corp., 9 Cir., 1961, 287 F.2d 228 (per curiam), and our conclusion must be that this patent is invalid.[7]

4. *Unfair Competition.*

At trial,[8] Bentley made three claims of unfair competition: for the copying of the device embodied in the mechanical patent, for the copying of the design patent, and for the copying of the display card on which the mold was mounted.

 But we have held both patents invalid, and the law of unfair competition does not prevent the copying of non-patentable articles unless the public is misled as to the source of those articles. Sears, Roebuck & Co. v. Stiffel Co., 1964, 376 U.S. 225, 232, 84 S.Ct. 784, 11 L.Ed. 2d 661; Compco Corp. v. Day-Brite Lighting, Inc., 1964, 376 U.S. 234, 238, 84 S.Ct. 779, 11 L.Ed.2d 669. Here the public could not have been misled. Sunset House advertised the mold in its catalogs and in other journals under its

7. Sunset House also contends that 35 U.S.C. §§ 102(d) and 172 preclude validity of the design patent here because the application for Japanese "design registration" was filed more than six months before Bentley applied for the American design patent. We find it unnecessary to consider whether the jury could conclude that the Japanese design registration was not "caused to be patented by * * * [the applicant's] legal representatives or assigns * * *," 35 U.S.C. § 102(d). Nor need we decide whether § 102(d) comprehends a ratification as well as a prior designation of representatives and consent to their acts.

8. Bentley claims that "The District Court erred in holding that defendant did not copy or cause to be copied, or in any way participate in any alleged copying of, plaintiff's meat ball mold or the advertising card upon which it was mounted." But his brief does not direct our attention to authorities or specify evidence in the record which might show the lower court's action to be unjustified. This alone would be sufficient basis, under our Rule 18(2) (d) & (e), for our declining to hear the appeal as to this point. But we prefer to err, if at all, on the side of generosity, and so entertain the claim.

own name. There was no intimation in that advertising that Bentley (or Westwood) was the ultimate source. Moreover, the molds sold by Sunset House were attached to display cards which showed it, rather than Bentley, to be the source.[9] That is sufficient to negative unfair competition liability under the "palming off" doctrine. Ibid.

We think the evidence also insufficient under the "secondary meaning" doctrine. To show that some secondary meaning existed, it was necessary for Bentley to establish that the public at least "has become accustomed to regard its * * * [product] as emanating, if not from it by name, at least from a single, though anonymous maker * * *." Shredded Wheat Co. v. Humphrey Cornell Co., 2 Cir., 1918, 250 F. 960, 963 (L. Hand, J.) ; I. Nims, Unfair Competition & Trade-Marks, p. 121 (3d ed.). This he has not done. Nor has he proved another necessary element, that the public bought Sunset House's competing molds *because* they supposedly emanated directly or indirectly from Bentley. Hygienic Specialties Co. v. H. G. Salzman, Inc., 2 Cir., 1962, 302 F.2d 614, 620.[10] The District Court properly held that unfair competition had not been proved. See Bliss v. Gotham Indus., Inc., 9 Cir., 1963, 316 F.2d 848, 854–856; Spangler Candy Co. v. Crystal Pure Candy Co., 7 Cir., 1965, 353 F.2d 641, 648; Hygienic Specialties Co. v. H. G. Salzman, Inc., supra, 302 F.2d at 621–22.

5. *Costs.*

Since we have held that the results to which that court came were correct, it is obvious that appellee was entitled to its costs. Rule 54(d), F.R.Civ.P.

Affirmed.

---

9. The display cards to which Westwood and Sunset House attached their molds were similar in several ways. Westwood, however, used the brand name "WESTWOOD," printed in bold letters at the top of its card, while Sunset's card, in equally bold letters located in the same place, proclaimed the brand name "CHADWICK." Under *Stiffel* and

---

*Compco,* supra, this is a sufficient differentiation.

10. We doubt that that factor ever could be proved with reference to such objects as that in suit, which the public buys because of "apparent quality and eye appeal" rather than the reputation of the producer. See ibid.