**CONTINENTAL CAN COMPANY, Inc.**

v.

**CROWN CORK & SEAL, INC.**

Civ. A. No. 33190.

United States District Court
E. D. Pennsylvania.

Nov. 27, 1967.

See also D.C., 39 F.R.D. 354.

Henry W. Sawyer III, Drinker, Biddle & Reath, Philadelphia, Pa., for Continental Can Co., Inc.; William K. Kerr, Herbert F. Schwartz, Fish, Richardson & Neave, New York City, of counsel.

Harry Shapiro, Shapiro, Cook & Kalodner, Philadelphia, Pa., for Crown Cork and Seal, Inc.; John W. Malley, James L. Dooley, Alvin Guttag, Cushman, Dar-

by & Cushman, Washington, D. C., of counsel.

KIRKPATRICK, Judge.

This is an action for the infringement of two patents,[1] 2654913 and 2654914, issued to Maier, both applied for July 27, 1950 and issued October 13, 1953, and both being method patents for making sealing members [2] or liners for metal caps of beverage bottles. In both, the liners are molded in the crown or metal shell of the cap, of a synthetic material known as plastisol. The only important difference between them is that the 914 patent calls for a second step, namely "curing" the molded liners in an oven, whereas in the 913 patent the curing is accomplished in a single step by the same means as the molding.

The defenses are invalidity for obviousness, invalidity for indefiniteness, non-infringement and double-patenting. The challenge on the ground of obviousness presents the main issue in the case

Plastisol is a colloidal suspension of particles of a resin in a liquid plasticizer. It is viscous or semi-liquid at room temperature but when heated to between 300° and 350°F., the resin particles absorb the plastisizer and swell, and further heating causes the swollen particles to fuse into a solid odorless inert vinyl-like material eminently suitable for the lining of metal caps for bottles. Plastisol was developed in Germany and Great Britian in the 1930's and was available in commercial quantities in the United States by 1946 or 1947.

Both patents disclose and claim a process in which plastisol in a flowable state is deposited in the metal shell or crown cap which is then positioned upon a heated platen where a heated plunger comes down upon it to apply light pressure, producing a wafer-like disc having

a thickened circumference which will form a seal between the crown and the lips of the bottle. In patent 913, the plunger remains on the plastisol for approximately six seconds, with the result that a solid liner ready for use is produced. In patent 914, the plunger is removed after two or three seconds, and final curing takes place in an oven further along the line.

Taking up the 914 patent first: the plaintiff relies on claims 2, 3, 5, 7 and 8 and cites as typical, claim 2, which is—

"The method of forming sealing pads for closure seals, comprising discharging into a closure shell having an internal lacquer coating of vinyl resin, a quantity of a semi-liquid resinous material comprising particles of a vinyl resin dispersed in a fluid vinyl resin plasticizer, pressing a heated forming plunger against the material while the closure shell is on a heated support for shaping the material into a sealing pad having an annular thickened portion and a central thin portion, maintaining the heat and pressure until the material adheres to the closure shell and has gelled into a shaped form-maintaining mass, and then disengaging the plunger and further heating the shaped mass until the material has become a cured essentially uniform mass."

The plaintiff's admissions in its brief and at the oral argument clear the way for us to arrive at once at the issue of obviousness without a detailed examination of much of the prior art cited by the defendant.

There is no dispute that in the manufacture of liners for bottle caps, a two-step process consisting of first molding and then curing in an oven is old. Production of discs of solid material by this method was well known, and crown liners so produced were in commercial production before the Maier patents

---

1. The rather complicated pleadings by which the issue was finally arrived at need not be recited in detail. The action, as now presented for trial, amounts to a

simple infringement suit with counter claim challenging validity.

2. Also referred to in the record as "crown liners", "gasket liners", "sealing pads" and "cushion pads".

issued. It was also admitted that the means disclosed in the patents by which the molding of the liners was accomplished, namely, heated plungers cooperating with heated platens, was not new. The characteristics of plastisol, its suitability for use as crown liners and its performance under heat and pressure, including its ability to solidify quickly after being heated to certain high temperatures, had been studied and the results published.

Thus, it appears that practically every major step of the process is to be found somewhere in the prior art. However, the combination claimed by the patents is no where disclosed. Specifically, there is no evidence of any prior art plunger-and-platen process in which plastisol was deposited in the metal cap in a semi-liquid or flowable state and molded in situ.[3]

The defendant's case for invalidity is based largely upon the textbook principle of patent law that the use of a new material whose characteristics are well known in an old process is not a patentable advance even though the new material is superior to the old and a better result is obtained. This principle has met with many exceptions or modifications since Hotchkiss v. Greenwood, 11 How. 248, 52 U.S. 248, 13 L.Ed. 683 (a decision generally accepted as its origin) with the result, that today there is no such inflexible rule of law if there ever was one. The authorities dealing with substitution of materials are simply a branch of the law relating to obviousness as enacted into Section 103 of the Patent Statute.

■ Decisions in the Third Circuit, both before and since the Patent Act of 1952, make it clear that patentability of a process may be found although the only new thing about it is the substitution of a new material, if such change is unobvious.

In Yablick v. Protecto, etc., Corp., 3 Cir., 21 F.2d 885, 887, the court said—"It is also the law, as exceptions to this general rule, that, if the substitution involved a new mode of construction, or if it developed new properties and uses of the article made, or where it produces a new mode of operation, or results in a new function, or *when it is the first practical success in the art in which the substitution is made*, or where the practice shows its superiority to consist not only in greater cheapness and greater utility, but also in more efficient action, it may amount to invention." (Emphasis added).

In Ellis-Foster Co. v. Gilbert Spraunce Co., D.C., 28 F.Supp. 375, 378, a decision affirmed by the Circuit Court of Appeals, 3 Cir., 114 F.2d 771, this court said, "That the substitution of one known material for another in a known combination may amount to invention, depending upon whether the step went beyond what was obvious to persons skilled in the art, is too well settled to require citation of authority."

I doubt that any court today would deny patentability to a process the only novelty of which consisted of the substitution of one material for another in a case where the new material was an unobvious choice.

■ The question then comes down to the issue of obviousness and we approach it in the light of the provision of the Patent Act of 1952 which made statutory the existing rule that "the burden of establishing the invalidity of a patent shall rest on the party asserting it." U.S.C., Title 35, Section 282. Commenting upon the rule, the Court of Appeals in Jones Knitting Corp. v. Morgan, 3 Cir., 361 F.2d 451—a case which involved patentable novelty over the prior art quoted and adopted the statement of the Supreme Court in

---

3. U.S. Patents 249407 and 2528506 to Foye were issued in 1949 and 1950 for a method of making crown liners from plastisol introduced into the metal cap in a more or less fluid form. However, the method was an entirely different one from that of the patents in suit, the molding being carried out not by plunger and platen but by spinning the cap.

Radio Corporation of America v. Radio Engineering Laboratories Inc., 293 U.S. 1, 55 S.Ct. 928, 79 L.Ed. 163 as follows—

"A patent regularly issued, * * * is presumed to be valid until the presumption has been overcome by convincing evidence of error * * * (It is the) common core of thought and truth, that one otherwise an infringer who assails the validity of a patent fair upon its face bears a heavy burden of persuasion, and fails unless his evidence has more than a dubious preponderance."

Turning now to the evidence, it appears that the industry was confronted with a problem as far back as the beginning of World War II and even before that. The problem was to find a satisfactory substitute for the generally accepted material—a composition of ground cork and binder materials—from which bottle cap liners were made. The search for such substitute was triggered by war restrictions. The need was a "very urgent one" and recognized as such by the government's War Production Board which convened a meeting in Washington in May, 1942, at which representatives of the government and substantially the entire industry exchanged information on technical experiences with every type of substitute previously tried, the problems encountered and possible solutions.

The search did not cease when war shortages came to an end. Cork has never proved a completely satisfactory material and cork liners were subject to excessive drying and consequent loss of sealing properties during storage, and mold growth in moist storage, conditions objectionable to flavor with beer and certain soft drinks, characteristics which necessitated the addition of inert "spots" upon the liners.

In 1940, the defendant began experimenting with rubber as a substitute for cork. Throughout World War II and during the years that immediately followed (1945–1949) it carried on "much research on cork substitute liners". During this period, it tested many liners made from a great variety of materials such as shredded bark, ground peanut hulls, cellulose fines, paperboard, rubber and plastics. The work was done in the defendant's research department which, by the 1950's, numbered some thirty employees.

As late as 1950, the defendant was still experimenting with rubber discs but in that year it initiated a project directed toward the development of a process for producing crown liners from precut solid discs of plastisized polyvinyl chloride. This approach yielded nothing of commercial value and finally, immediately upon learning of the Maier patents, the defendant's research and development department gave up rubber and based its work upon the Maier methods, directing it particularly to the "circumvention of the Maier et. al. patents". After about three years of effort along this line, the defendant decided to embark on production of liners by the method now accused as an infringement.

Paralleling the defendant's research, the plaintiff also spent a great deal of time in the search for a cork substitute.

During the early 1940's, a fluid latex compound was used in a process which formed the liner by spinning the crown. In 1946, the plaintiff's attention was called to a method used by Gora & Lee, a comparatively small manufacturer, whose plant was visited by representatives of both the plaintiff and the defendant. Although the method was very similar to that of the Maier patents, the material used by Gora & Lee was not plastisol but solid rubber discs. Research at Continental proceeded thereafter (mainly under the direction of Maier) until it eventuated four years later in the application for the Maier patents in July of 1950.

Production of liners by the plaintiff after the issuance of the Maier patents proved to be very much of a commercial success. Crowns made by the methods of the patents have replaced "spotted in" cork-lined crowns for a number of the large bottling concerns including all but

two of the major U. S. breweries and Canada Dry and other soft drink bottlers. The plaintiff's sales of plastisol-lined crowns in 1965 amounted to 30 million gross which was approximately 39% of its total crown sales. The defendant sold 31 million gross in 1965 or approximately 28% of its crown sales in that year. The combined crown sales of the plaintiff and the defendant was, in 1963, close to two-thirds of the total crowns sold in the United States.[4]

All this adds up to an urgent demand for a satisfactory substitute for cork plus a long period of research and experimentation carried on by the two largest manufacturers in the country with failure to achieve any satisfactory result until the advent of the patents in suit plus, in addition, a remarkable record of commercial success.

These factors constitute evidence from which patentability may be found. I am convinced that the substitution of plastisol in a semi-fluid state for other known materials was, under the circumstances of this case, an unobvious step.

In Jones Knitting Corp. v. Morgan, supra, the Court said, "We * * * also note the commercial success of the Morgan fabric, the long felt need for the invention, and the availability of the tools to produce the invention and the failure of others to achieve the result. The relevancy of such considerations is acknowledged in the statement of the Supreme Court in Graham v. John Deere Co., supra.[5]

'Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc. might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy. See Note, Subtests of

'Non-obviousness,' 112 U.Pa.L.Rev. 1169 (1964).' "

Referring to the fact that there was a "real need" for the fabric which was the subject of the patent involved and that no one had come up with a commercially successful product until the patentee, that there was a great interest in the industry to develop a fabric having the characteristics desired by salesmen and "the overriding commercial success" of the patented fabric, the Court said,

"All of this is very strong evidence of invention entitling the defendants to a valid patent in the face of a lack of any convincing testimony, on the part of those skilled in the art, of obviousness."

■ I am aware that there are statements in some opinions to the effect that the existence of a problem and of protracted search for a solution of it will not, of themselves, support a finding of patentability. Under the decision in the Graham case, they do, however, in a proper case constitute evidence and even if there were nothing in the case except the switch to a different material, it seems to me that Maier's contribution was not so clearly obvious that I may not base a finding of patentability upon the circumstances which the court in the Graham case called secondary evidence.

It is to be remembered that in the present case the search for a method using a substitute for cork did not consist of sporadic efforts by small or ill-equipped concerns. It was carried on by the research departments of the two largest producers in the country, whose combined output runs into the billions. It may not be easy to put one's finger upon the exact factors which produced the result which turned the unsuccessful attempts of the industry into a commercial success but certainly there is at least serious doubt whether a man ordinarily skilled in the art would have realized that semi-liquid

4. The fact that since 1963 there has been a falling-off in the number of plastisol-lined crowns sold in the United States, possibly due to the increased use of cans in place of bottles for beverages, does

not in any way affect the force of the figures showing the immediate commercial success of the patented process.

5. 383 U.S. 1, 17, 86 S.Ct. 684, 15 L.Ed.2d 545.

plastisol would cure quickly enough to be satisfactory[6] and that the plunger could be removed without damaging the molded shape.

The step taken by Maier in his patents does seem so simple that one wonders why neither Crown Cork & Seal or Continental Can came upon it sooner than they did. This may sound like a suggestion that Maier's contribution to the art was an obvious one, but the plain fact is that it is inconceivable that these two giants of the industry, with practically limitless resources for research and abundant equipment and scientific personnel, could have searched and experimented for years without being able to arrive at a satisfactory result if, all the time, the solution of the problem was perfectly obvious to any of their workers ordinarily skilled in the art.

This record, I think, furnishes a strong and convincing case for nonobviousness of Maier's method of solving the problem with which the industry had been concerned.

■ The process practiced by the defendant includes all the major steps set out in Claim 2. It begins with depositing in a shell having an internal lacquer coating of vinyl resin, a quantity of semi-liquid resinous material comprising particles of a vinyl dispersed in a fluid vinyl resin plastisizer, terms which properly describe plastisol, (referred to in the testimony as "paste resin"). The shell is then moved to a molding press where it rests on a heated platen and a heated plunger is brought into light contact with the plastisol. The heat and pressure is maintained until the plastisol adheres to the closure shell and has gelled into a shaped form-maintaining circular disc (in practice, a matter of three to four seconds). The crown is then moved on what the defendant's witness described as a "curing conveyor" through a "post cure oven".

The generally accepted test for infringement of a process claim is whether the accused process reaches the same result as the patent by the same, or substantially the same, means. At only one point is there any question whether the defendant's process fully meets this test. Claim 2 of the 914 patent contains a requirement that the material in the shell be disengaged from the plunger when it "adheres to the closure shell and has partially gelled into a shaped, form-maintaining mass". The defendant contends that its liners are fully, rather than partially, cured (gelled) at the time they leave the platen and plunger. I think that the evidence clearly shows that the defendant's liners are not fully cured at that point. It is true that they will seal bottles effectively and that the disc has reached the point where it is comparatively clear or translucent. However, tests made by the plaintiff's witnesses establish to my satisfaction that the liners are changed substantially, as indicated by a gain in tensile strength and elongation, by the defendant's oven treatment, and I think that the term "partially cured" or "partially gelled" applies even though the liners which it describes are usable, if the manufacturer requires additional oven heating in order to give them the properties which it desires them to have when marketed.

■ Patent 913 is not infringed. The process claimed is essentially different from that claimed by patent 914 and practiced by the defendant in that as has been noted the former calls for complete curing underneath the plunger whereas the latter requires only partial curing at that point and the completion of the process in an oven. This is not a mere matter of words. The separate curing in the oven is an essential part of the defendant's process. It frees the more complicated and expensive press for additional production in approximately half the time required by the process

---

6. It will readily be seen that in any production running to the quantity of that in the present case the saving of seconds is a matter of the utmost importance.

disclosed in the 913 patent. This may seem a slight improvement but it is nevertheless a substantial one when the immense volume of the output of these operations is considered. Only if the second, or oven-curing, step could be considered a useless appendage of the plunger and platen operation (and that it is not) could it be disregarded and the defendant's process be an infringement of 913.

The defendant explains the use of an oven in the process as practiced by it as simply a means of imparting to the cap liners a gloss, but is seems unlikely that the defendant added this substantial step to its process for the sole purpose of improving the appearance of the finished disc in a particular which the customer never sees until he opens the bottle.

My holding of non-infringement is based entirely on the foregoing consideration and not upon the defendant's contention that its puffed liners contain a vaporizable component. As to that, I accept Dr. Bruin's testimony that the defendant's puffed or foamed liners are essentially free of vaporizable components.[7]

The defendant has raised the defense of double patenting.

■ The vice against which a defense based on double patenting is properly directed is unlawful extension of a patent monopoly. There can, of course, be no extension of a monopoly in the present case because the patents expire on the same day. There are, as pointed out In re Robeson, 331 F.2d 610, 51 CCPA 1271, a number of reasons other than the extension of monopoly to apply the rule and invalidate one of the patents. However, there is no double patenting within the terms of the rule where the two patents are for separate inventions and are patentably distinguishable. See In re Robeson, supra; Application of Kaye, 332 F.2d 816, 51 CCPA 1465. That is the situation in the present case. It has already been held that the defendant's process infringes the 914 patent but does not infringe 913. The ruling that one patent is infringed and another not, had to be and was, made upon the premise that the two patents are for separate inventions. I think that these patents are, in addition, patentably distinguishable and therefore I cannot sustain the defendant's contention of double patenting.

■■ Another defense raised by the defendant is that the patents are invalid for indefiniteness under 35 U.S.C. Sec. 112 in that there is no test or means disclosed in either of them for determining what constitutes "cured" and "partially cured" and therefore the public cannot tell their metes and bounds. However, the patents in suit contain extensive and detailed disclosure of the time, temperatures and pressures for carrying out the two-step (914) and one-step (913) molding and curing methods. The condition of the liners after the completion of each process is clearly specified both as to physical form and properties necessary for intended use. The mere fact that a patent specification contains no disclosure of a specific test procedure is not the bar to a valid patent as long as the patent otherwise teaches the art how to practice the invention. The

---

7. The plaintiff's position on the issue of infringement of patent 913 is stated in its brief as follows:

"We do not assert, and never have asserted, that the method used by defendant in commercial production of plastisol-lined crowns infringes both patents in suit. The evidence offered by plaintiff at the trial clearly establishes, we submit, that the 2,654,914 claims in suit are infringed.

If, however, plaintiff has not sustained its burden of proof on this issue, it is plain that defendant's admissions establish infringement of the 2,654,913 patent."

Inasmuch as it has been found that the plaintiff has sustained its burden of proof on the issue of infringement of 914, it may be assumed that the plaintiff is not contending that the defendant is infringing the 913 patent.

specifications of the two patents are sufficiently definite and explicit.

In view of the foregoing, I hold patent 914 valid and infringed and patent 913 valid but not infringed.