**CONTINENTAL CAN COMPANY, Inc.**

v.

**CROWN CORK & SEAL COMPANY, Inc., Appellant.**

**No. 17290.**

United States Court of Appeals Third Circuit.

Argued Jan. 21, 1969.

Decided July 23, 1969.

Rehearing Denied Sept. 16, 1969.

Gerald McLaughlin, Circuit Judge, dissented.

H. Francis DeLone, Dechert, Price & Rhoads, Philadelphia, Pa. (Harvey Bartle, III, Virgil E. Woodcock, Woodcock, Phelan & Washburn, Philadelphia, Pa., on the brief), for appellant.

William K. Kerr, Fish, Richardson & Neave, New York City (Henry W. Sawyer, III, Philadelphia, Pa., Herbert F. Schwartz, New York City, on the brief), for appellee.

Before HASTIE, Chief Judge, and Mc-LAUGHLIN and STAHL, Circuit Judges.

## OPINION OF THE COURT

HASTIE, Chief Judge.

This is a patent infringement suit, with a counterclaim asking that the court declare plaintiff's patents invalid. Continental Can Company, Inc., the plaintiff below, owns patents No. 2,654,913 (hereafter designated as 913) and No. 2,654,-914 (hereafter 914), both issued on October 13, 1953, on the application in July 1950 of Curtis E. Maier, an employee of the plaintiff. The plaintiff alleges that the defendant, Crown Cork & Seal Company, Inc., has infringed the Maier patents by the manufacture and sale of articles made by a process that differs from Continental's only in insignificant details.

The district court, sitting without a jury, found both the Maier patents valid and that 914 had been infringed. 281 F.Supp. 474.[1] The defendant has appealed.

Both patents in suit relate to a method for lining metal caps commonly used on beer and soft drink bottles with a synthetic material known as plastisol. In the method disclosed by patent 913,

---

1. The amount of damages resulting from the infringement of 914 was left for reference to a special Master.

an unlined bottle cap, open side up, moves under a heated nozzle through which a small quantity of hot liquid plastisol is deposited into the cap. The cap is then conveyed onto a heated platform where a heated plunger descends and compresses and shapes the plastisol within the the cap. At a temperature of 375 degrees Fahrenheit, with 75 pounds per square inch pressure, the shaping under the plunger requires as long as six seconds. Apparently the amount of time required for molding inhibited successful commercial exploitation of this patent.

Patent 914 discloses as a first step a process similar to the 913 patent except that the cap, with its plastisol contents, may be under the heated plunger for as little as one second, but more often two or three seconds. The cap is then immediately conveyed into a heated oven where the already molded plastisol liner hardens to the firmness desired in the finished product.

At the outset we observe that these are method patents, disclosing a way in which heat and mechanical means are used to convert a globule of plastisol, a known substance, into a liner fitted into a bottle cap. Moreover, the methods taught employ mechanical structures found in the prior art, as seems to be conceded by the appellee. The use of a heated nozzle to deposit hot liquid composed of resin, a plasticizer and a congealing agent in an inverted bottle cap to form a lining was taught by South African Patent No. 2556/47 as early as 1947. The molding of a bottle cap liner under a heated plunger as the inverted cap rests on a heated platform and the subsequent transfer of the cap to an oven are disclosed by United States Patent No. 2,688,776, issued in 1954, but applied for in May 1950 prior to the July 1950 application for the patent in suit. Indeed, as the court below properly observed, " * * * it appears that practically every major step of the process is to be found somewhere in the prior

art." 281 F.Supp. at 476. The question in dispute is whether the procedures disclosed by the patent would not have been obvious to a person ordinarily skilled in the art involved, in the light of the disclosures in the prior art.

The conclusion that Continental's patents were nonobvious seems to have been based on the district court's findings of "the existence of a problem and of protracted search for a solution of it," and the court's view that there was "serious doubt whether a man ordinarily skilled in the art would have realized that semiliquid plastisol would cure quickly enough to be satisfactory and that the plunger could be removed without damaging the molded shape." 281 F.Supp. at 478, 479. (Footnote omitted). The court also stressed the noteworthy commercial success of the Maier process.

The Supreme Court has suggested recently that:

"Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy." Graham v. John Deere Co., 1966, 383 U.S. 1, 17, 18, 86 S.Ct. 684, 694, 15 L.Ed.2d 545.

However, such considerations, by themselves, cannot support a finding of nonobviousness if it is established otherwise that a patent teaches nothing of significance that has not already been disclosed. National Connector Corp. v. Malco Mfg. Co., 8th Cir. 1968, 392 F.2d 766 cert. denied, 89 S.Ct. 254, 393 U.S. 923, 21 L.Ed.2d 259; Continental Can Co. v. Old Dominion Box Co., 2 Cir. 1968, 393 F.2d 321; Higley v. Brenner, 1967, 128 U.S.App.D.C. 290, 387 F.2d 855; Bentley v. Sunset House Distributing Corp., 9th Cir. 1966, 359 F.2d 140; Chemical Construction Corp. v. Jones & Laughlin Steel Corp., 3d Cir. 1962, 311 F.2d 367.[2]

2. To the extent that a dictum in Yablick v. Protecto, etc., Corp., 3 Cir. 1927, 21 F.2d 885, at 887 may indicate otherwise, that dictum is not approved and will not be followed.

It thus appears that the validity of the patents in suit is dependent upon the contention that a man ordinarily skilled in the art and aware and mindful of the prior art's teachings would not have realized that semi-liquid plastisol could be molded into a bottle cap liner, at commercially practical speeds, by placing an inverted cap on a heated platform and merely "kissing" [3] a plastisol globule inside the cap with a heated plunger. The critical contention that the feasibility of such a method was not obvious is grounded on the assertion that a man ordinarily skilled in the art would not think that the globule of plastisol in the cap would become sufficiently firm under a brief touch of a heated molding plunger to allow the plunger's removal without damaging the molded shape of the plastisol.

To test this contention we examine the prior art, since, in legal contemplation, one of ordinary skill in the art is chargeable with comprehensive knowledge of it. See Chemical Construction Corp. v. Jones & Laughlin Steel Corp., supra; Blisscraft of Hollywood v. United Plastics Co., 2d Cir. 1961, 294 F. 2d 694, 696. Early literature disclosed that plastisol in a fluid state could quickly be converted into a solid substance by heating to temperatures between 275° and 375° Fahrenheit—temperatures which were employed in the 914 process. The India-Rubber Journal of August 31, 1946 disclosed that "The fluid nature [of plastisol] in either the moulded or coated form is converted to a finished resin by heat treatment at 300–350° F. in a matter of seconds, depending on thickness and on the means of heat application." And in British Plastics of April 1948, at page 167, it was pointed out that "the change from the fluid to the elastic state is accomplished by heating, and at 150 deg C the transition is practically instantaneous." [4]

We recognize that the prior art includes some suggestion that molds be cooled prior to separation from the plastisol,[5] but we find no admonition that removal without cooling would result in a deformation of the plastisol article. On the contrary, we have found disclosed in the prior art the following teaching:

"To cure the plastisols to tough, rubbery masses, baking temperatures at least as high as those needed for organosols must be used (350 deg. F. or 177 deg. C.). Again, the time required may be quite short, only sufficient to insure that the entire mass reaches the requisite temperature." Official Digest, Federation of Paint and Varnish Production Clubs, Dec. 1946, article entitled "A New Technique in Coatings, 'Vinylite' Resin Dispersions."

Inferentially at least, one of the properties of a "tough, rubbery mass" would be its susceptibility to separation without damage from its mold, regardless of how short a time it has taken to achieve that "tough, rubbery" state. Moreover, this characteristic of plastisol was disclosed and utilized in patent No. 2,638,633, applied for by Andrew Root in September 1949. In the Root method of forming shoe soles liquid plastisol is poured into a mold heated to 270 to 325 deg. F.[6] After sixty seconds, the plastisol adjacent to the mold has formed a shape retaining shell, and the shoe, which formed the top part of the mold, is then lifted

---

3. This is counsel's terminology used at argument before this court to describe appellee's process.

4. We find no significant distinction between the times contemplated by "in a matter of seconds" or "practically instantaneous" in the literature and the time of two to three seconds suggested for heat-molding in the 914 patent.

5. E. g. Modern Plastics, June 1947, p. 111; Kunstoffe [Synthetic Substances], May 1942, p. 138.

6. While the patent refers to 270 to 325 degrees Centigrade, plaintiff has stipulated that 270 to 325 degrees Fahrenheit is the correct measure.

free of the mold, bringing with it the adhering shell.[7] Cooling the mold is not to be found in this process.

Therefore, we believe that a person ordinarily skilled in the art would have been informed and should have understood that a molding plunger could be removed from a plastisol mass, with no damage resulting to the mass, once it had been heated to about 350 deg. F., and that, if only a small amount of plastisol were to be molded, the process could be very brief.

This conclusion is significantly supported by the testimony of Maier himself in regard to the development of his process. His testimony reveals that the Dewey & Almy Chemical Company had suggested to him that plastisol would make a suitable cap liner; that he conceived the idea of shaping it in the cap by means of a punch; that in the first attempts the molding punch or plunger was not heated and the results were unsatisfactory; that then a heated plunger was used and when the temperatures of the plunger and the cap, positioned on a heated platform, were controlled the process was successful; and that this happened within a week of his first going forward with the idea. Thus there is no indication that Maier, once having conceived the idea of using a heated molding plunger,[8] had to wrestle with any problem of adhesion of the plastisol to the plunger. It is true that when Continental's staff put Maier's process to a test, initial difficulty was experienced with plastisol sticking to the plunger. But within days this problem was solved merely by the application of adequate heat to the plunger and the platform. All of this was simply the application of existing knowledge.[9]

This court has considered extensive testimony and many pages of statistics and studies that show to what extent the plastisol is made firm under the molding plunger and how far partially "cured" or fully "cured" plastisol stretches. These details seem to have been introduced to explain scientifically why Maier's method works as it does. But although these explanations may be elaborate or complex, they may not be considered as evidence of nonobviousness of the achieved result, since there is no evidence that Maier's discovery of these reasons led him to develop his method. On the contrary, the studies were made and statistics gathered after the event to provide an explanation of the chemistry of the already working method. *Cf.* Cresap v. Chemplast, Inc., D.N.J. 1962, 216 F.Supp. 870, affirmed per curiam, 3 Cir. 1963, 316 F.2d 920.

For these reasons we find patent No. 2,654,914 invalid. A fortiori, the less elaborate 913 patent, which does not teach the alleged novelty of merely "kissing" the plastisol, is not inventively distinguishable from already established methods of molding plastisol.

The judgment of the district court filed March 18, 1968 will be vacated and the cause remanded for the entry of a judgment denying relief on the plaintiff's claim and, on the defendant's counterclaim, adjudicating both patents invalid.

---

7. The mass adheres to the shoe since the plastisol adjacent to it does not reach the temperature range necessary for easy separation. This result, of course, is intended.

   This process may not be distinguished from the patents in suit because of the molding times involved. In the Root process the sixty second molding time is the result of the large quantity of the plastisol used. In the Maier method the comparatively minute quantity of plastisol employed allows the critical molding temperature to be reached in two or three seconds.

8. That Maier thought of using a plunger is not inventive since this procedure had been included in numerous older cap lining methods.

9. Thus, Maier's own deposition suggests that what made his process work satisfactorily was heating of the plastisol to the 300–350 deg. F. temperature range. As had been pointed out, the fact that plastisol becomes tough and rubbery under such conditions was disclosed in the prior art.

GERALD McLAUGHLIN, Circuit Judge (dissenting).

The admitted issue here is whether the Maier 914 method patent is invalid for obviousness. I agree with Judge Kirkpatrick in the District Court that patent 913 is not infringed. I do not understand the majority opinion to dispute the directive of the governing Patent Act U.S.C. Title 35, § 282, that "[t]he burden of establishing the invalidity of a patent shall rest on a party asserting it." That burden is a heavy one. To overcome the assumption of a patent's validity there must be "convincing evidence of error". Radio Corporation of America v. Radio Engineering Laboratories, Inc., 293 U.S. 1, 7, 55 S.Ct. 928, 79 L.Ed. 163 (1934). In the light of the whole true historical picture of the efforts to make satisfactory liners for metal caps of beverage bottles let us see if the Maier 913 patent of procedures to produce such a liner were obvious to a person ordinarily skilled in the art involved. The problem was factual. The opinion in the recent Eimco Corporation v. Peterson, etc. Co., 406 F.2d 431, 435, 436 (10 Cir. 1968); rehearing denied, March 17, 1969, presents this very well, saying "As indicated in the Graham case, obviousness 'to a person having ordinary skill in the art' is an illusive factual subject to be determined by the trial court * * * which determination should not be set aside in the absence of clear error." In another late decision, Amerline Corporation v. Cosmo Plastics Company, 407 F.2d 666 (7 Cir. March 3, 1969), the fact finding of the trial court that the suit patent was invalid for obviousness was affirmed because it was not "clearly erroneous".

The majority, because as the trial court said "practically every major step of the process is to be found somewhere in the prior art", would have it that what Maier did "was simply the application of existing knowledge". What Maier actually did was to substitute plastisol in a semi fluid state for other known materials. That combination was new, mint fresh, completely Maier's. It was what interested parties e. g. the plaintiff and defendant before us, had been unsuccessfully trying to achieve for years.

The substitution of material as Maier accomplished it, under the particular unescapable facts, did constitute invention. That doctrine is sound patent law and so recognized generally, including this circuit. Back in 1920, Low v. McMaster, 266 F. 518 (3 Cir. 1920) dealt with a comparable problem, a substitution of a solid for the liquid fuel of the prior art. Judge Woolley for the court, in upholding both said patents, stated regarding the substitution of materials as constituting invention, pp. 519, 520:

"It is also the law, as exceptions to this general rule, that if the substitution involved a new mode of construction; or if it developed new properties and uses of the article made; or where it produces a new mode of operation, or results in a new function; or when it is the first practical success in the art in which the substitution is made; or where the practice shows its superiority to consist not only in greater cheapness and greater utility, but also in more efficient action, it may amount to invention. Smith v. Goodyear Dental Vulcanite Co., 93 U.S. 486, 496, 23 L.Ed. 952; Celluloid Mfg. Co. v. Crane Chemical Co. (C.C.) 36 Fed. 110; Potts v. Craeger, 155 U.S. 597, 608, 15 Sup.Ct. 194, 39 L.Ed. 275; Walker on Patents, §§ 28, 29, 36."

"These are the principles to be applied here."

In a later decision of this court which was also fundamentally similar to the case at bar, Spruance Co. v. Ellis-Foster Co., 114 F.2d 771 (1940), Judge Biggs for the court said:

"In the light of the foregoing we think that Weber did demonstrate inventive genius, that he seized upon a thing which was available to all but which had been grasped by none, and was able to fit it into a new place, to cre-

ate an original and useful result. We conclude that this was not the exercise of mere mechanical ingenuity or a step in the natural development of an art, but was in fact invention. The case at bar presents an almost classic example of a new use."

Yablick v. Protecto Safety Appliance Corporation, 21 F.2d 885 (3 Cir. 1927) passed upon the same sort of factual basics as are the major elements of the instant appeal. There a known chemical, substituted for substances unsuccessfully used in the apparatus concerned, was upheld as patentable. The court said p. 886 with reference to the substitution, "This fact was not translated into commercial utility until the genius of the patentees discovered it."

There can be no possible misunderstanding of the opinion of the trial judge. He correctly found invention in the substitution of the plastisol. Because Maier's invention was genuine and vital in its special field, the facts that the entire industry had been unable to solve the liner difficulty and the great commercial acceptance of the new combination, though of secondary consideration were under Graham v. John Deere Co., 383 U.S. 1, 18, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966) relevant as indicia of non-obviousness against the true invention background of the Maier process. The court fully understood this and so plainly indicated in the opinion. In addition it was quite properly noted in connection with the merits, that in this suit, as in Jones Knitting Corporation v. Morgan, 361 F.2d 451, 458 (3 Cir. 1966), there exists "a lack of any convincing testimony of those skilled in the art, of obviousness."

The carefully reasoned, fully documented opinion of the trial court is firmly rooted in current governing patent law. To casually brush it aside where the contention of obviousness does not even have "a dubious preponderance" [1] is

a distinct loss to a much needed, high level implementation of that law. I would affirm the judgment of the District Court.

---

1. Radio Corporation v. Radio Engineering Laboratories, supra, p. 8.