**EAGLE IRON WORKS**

v.

**McLANAHAN CORPORATION,**
Appellant.

No. 17925.

United States Court of Appeals,
Third Circuit.

Argued Jan. 23, 1970.

Decided July 9, 1970.

William H. Pattison, Jr., Pattison, Wright & Pattison, Washington, D. C. (William H. Webb, Webb, Burden, Robinson & Webb, Pittsburgh, Pa., on the brief), for defendant-appellant.

Thomas E. Dorn, Wallace, Kinzer & Dorn, Chicago, Ill. ( V. A. Peckham, Brown, Murray, Flick & Peckham, Pittsburgh, Pa., Kinzer, Dorn & Zickert, Chicago, Ill., on the brief,) for plaintiff-appellee.

Before FORMAN, SEITZ and ADAMS, Circuit Judges.

OPINION OF THE COURT

FORMAN, Circuit Judge.

This is an appeal by the McLanahan Corporation of Hollidaysburg, Pennsylvania, from a judgment of the United States District Court for the Western

District of Pennsylvania in favor of Eagle Iron Works [Eagle], a corporation of Des Moines, Iowa. The case involves a patent infringement suit instituted by Eagle against McLanahan under 28 U.S. C. §§ 1338(a) and 1400(b), alleging infringement of United States Letters Patent No. 3,160,321. McLanahan urges that the patent is invalid as obvious and that Eagle is estopped from claiming infringement because McLanahan acquired intervening rights as a result of a Certificate of Correction issued to Eagle and because of Eagle's inequitable conduct before the Patent Office in securing the Certificate. The case was tried without a jury and the District Judge held that the patent was valid; that McLanahan had infringed claims 1, 2, 3, 15 and 16, and that Eagle was not estopped from claiming infringement.

The patent in question is known commercially as "AUTOSPEC." It is an automated control system for a water scalping and sand classifying tank, a principal element in the apparatus of modern sand plants, which classifies sand and gravel by size and reblends them to given specifications. It was developed by Clement B. Cochran, an employee of Eagle, who began working on it in 1959. The first patent application was filed in 1961. Ultimately, the patent in suit, numbered 3,160,321, was issued on December 8, 1964 to Mr. Cochran, assignor to Eagle.[1]

In general, sand is classified by size by introducing a slurry mixture of sand and water into a water scalping and sand classifying tank. The tank is an elongated V-shaped rectangular receptacle which allows the slurry to flow longitudinally into it. The coarser sand settles first nearest the feed end and progressively finer sand settles toward the other end. This settling occurs as a result of two forces: (1) the velocity of the slurry stream; and (2) gravity. Slimes and extremely fine particles are discharged at an overflow weir at the end opposite the introduction point.

In a conventional tank reblending was accomplished by a series of discharge stations located along the bottom of the tank. Each station discharged a different size sand. Discharge occurred when a sand level sensing device, such as a paddle on a rotating shaft, usually 14 to 18 inches above the bottom of the tank, determined an adequate accumulation of sand. When this occurred, the station opened and the sand flowed into a splitter box. Each splitter box (one for every station) had two or more discharge gates connected to separate flumes. If two different specifications were desired, a three-gate splitter box was used, two gates for products and one for waste. Each gate of the box was manually adjusted to give the desired proportion. The two proportions representing products were then passed into

---

1. The chronology of pertinent Patent Office filings was:

*September 26, 1961*—Application for patent, Serial No. 104,914, in the name of Clement B. Cochran.

*August 23, 1962*—First official action issued by Patent Office, but that patent application was not prosecuted to a final determination.

*August 23, 1963*—A second patent application, Serial No. 304,727, filed as a continuation in part of original application, Serial No. 140,914. It added Figures 8 and 9 which incorporated maximum and minimum timers.

*June 4, 1964*—Application Serial No. 140,914 was abandoned in favor of continuation-in-part application Serial No. 304,727.

*December 8, 1964*—United States Letters Patent No. 3,160,321 issued to Clement B. Cochran as assignor to Eagle Iron Works from application Serial No. 304,-727.

*October 21, 1965*—Application for Certificate of Correction by Eagle correcting Claims 1, 3, 6 and 18.

*March 1, 1966*—Certificate of Correction issued pursuant to foregoing Application.

This suit was instituted January 6, 1966 prior to the issuance of the Certificate of Correction by the Patent Office but a supplemental complaint was filed on May 11, 1966 incorporating an allegation concerning the issuance of this Certificate.

two separate flumes to form the two specification products. A typical arrangement was a three gate box where two gates were set for products, one cement and one concrete, and the third for waste. The structural and functional details of the operation of the conventional tank, as described above, were well known in the art at the time of the Cochran invention.

The primary problem with a conventional tank was that the size gradations fed into the tank could vary, creating a corresponding variation in the amounts available at each discharge station. This made it necessary to sample each product at frequent intervals to determine whether it was receiving a proper proportion of the various sizes of sand. If the proper proportion of one size was not being fed into the products, the gates had to be adjusted accordingly. Without constant sampling and readjusting, large build-ups of non-specification material resulted.

The Cochran invention eliminates the manual operation and the need for splitter boxes. It produces a continuous product despite changes in the input to the tank. To accomplish this, it employs a number of timers that measure the cumulative times of sand discharged from the individual outlets at the discharge stations. This cumulative timing mechanism is one of the essential features of the Cochran invention. Simply described, it is a system having three outlets with two discharge stations for products and one for waste, which operates as follows: When the predetermined amount of sand at any outlet is discharged, the timer "times out" and closes the valve. The excess material is diverted to either another product outlet at the discharge station or to a waste outlet. When all the outlets for a product "time out" the system resets itself.

Late in 1962, McLanahan, a competitor of Eagle in the manufacturing and sale of this type of machinery, undertook to develop an automatic system to control its sand classifying and water scalping tanks. Allegedly, this undertaking was totally independent of Eagle's work.[2] McLanahan solicited the aid of Jordan Controls, a supplier of electrical control apparatus. McLanahan submitted to Jordan a set of specifications of the type of system it desired together with drawings pursuant to which and under McLanahan's direction Jordan designed a system which McLanahan incorporated in its tanks and sold under the name of "CARDO-MATIC." One of its sales was to Fayettville Sand and Gravel Inc., in Fayettville, North Carolina in March 1965. It is this system that Eagle alleged, and the District Judge found, infringed the Cochran invention.

Practically all of the facts involved in this litigation were stipulated by the parties. There is little contest as to McLanahan's infringement of the Cochran patent unless McLanahan prevails in its contention that the patent is void for obviousness, that the Certificate of Correction was invalidly issued or on its subsidiary assertions that it had intervening rights and that Eagle acted in bad faith in inducing the Patent Office to issue the Certificate of Correction.

### Defense of Obviousness

McLanahan claims that the Cochran invention is invalid under 35 U.S.C. § 103 which states:

"A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the

2. AUTOSPEC was exhibited February 5 through February 8, 1962, in Chicago, at the trade show of the National Sand and Gravel Association. Since several of McLanahan's employees attended that show, knowledge of the system was available to McLanahan, although its witnesses denied that they saw the exhibit. Also, by spring 1962, nine systems embodying the Cochran invention had been sold by Eagle.

time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made."

In Graham v. John Deere Co.,[3] the Supreme Court outlined the applicable test in determining obviousness as follows:

"Under § 103, the scope and content of the prior art are to be determined, differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or non-obviousness of the subject matter is determined." [4]

In connection with this test, it is important to note that under 35 U.S.C. § 282, a patent is presumed valid and the burden of establishing invalidity is on the party claiming it.[5]

At trial, McLanahan introduced into evidence five patents as prior art which it argued proved that the Cochran invention was obvious in 1961.[6] The five patents are: (1) Martin, No. 2,766,886, issued April 2, 1951; (2) Saxe, No. 2,760,-634, issued December 18, 1951; (3) Simmons No. 3,012,156, issued March 13, 1957; (4) Nielson, No. 2,948,437, issued April 24, 1957 and (5) Lovette, No. 3,-042,261, issued October 27, 1958.[7]

McLanahan contends that the District Judge's holding that Eagle's patent was valid and infringed was erroneous both in law and fact. Specifically it urged that his conclusions that the prior patents it introduced did not in fact constitute prior art in these proceedings were meaningless under a section 103 defense, having relevance only if a defense under section 102 had been asserted.[8] More-

---

3. 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966).

4. *Id.* at 17, 86 S.Ct. at 694. And in Anderson's Black Rock Inc. v. Pavement Salvage Co., Inc., 396 U.S. 57, 62, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969), a case involving a combination patent, the Court reminded us of its admonition "that strict observance of those requirements is necessary."

5. 35 U.S.C. § 282 in part reads: "A patent shall be presumed valid. The burden of establishing invalidity of a patent shall rest on a party asserting it."

6. Mr. Cochran is charged with a comprehensive knowledge of the prior art. Continental Can Company v. Crown Cork & Seal Company, 415 F.2d 601, 603 (3 Cir. 1969).

7. Two of the five patents (Saxe and Nielson) were considered and discarded by the Patent Office at the time of the application. At trial McLanahan did not attempt to show that these two patents rendered the Cochran patent obvious. Instead, they were introduced into evidence to establish that the Patent Office gave them consideration rather than more relevant examples of prior art. McLanahan's expert, Franklin W. McCorkel, testified as follows: "Q. Now, Mr. McCorkel, within your skill and knowledge of this particular art, what is your opinion as to the relevancy of those two patents [Saxe and Nielson] on the subject matter of the Cochran patent as compared with the relevancy of the Lovette and Simmons patents to which you have previously referred? "A. Well, I do not think there is too much relevancy to the Nielson or Saxe patents. Not nearly as much relevancy as there is in the case of Simmons or Lovette. "Q. You feel that Simmons and Lovette are more closely aligned to and related to the subject matter of the Cochran patent than the disclosure of these two? "A. Definitely. Much more closely, sir."

8. 35 U.S.C. § 102 states: "A person shall be entitled to a patent unless

(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, or

(c) he has abandoned the invention, or

over, McLanahan asserts that although the District Judge recognized the criteria for obviousness of the subject matter of an issued patent laid down in Graham v. John Deere Co.,[9] it made only summary conclusions that the subject matter of the patents was non obvious without meaningful findings of fact in support of such conclusions.

Of the three patents upon which McLanahan relied to prove obviousness, the Lovette patent dispenses rocks of varying size from different bins situated along a conveyor belt. The system depends on a constant supply of material in each bin. Unlike the Cochran invention, it does not control a varying output. More importantly, there is no cumulative time measuring control.[10]

The Simmons patent is a system designed to perform routine industrial plant operational functions. It does not specifically refer to sand but it is claimed to operate any machine of almost any nature. It is questionable whether it could be adapted to a tank which does not have a constant flow of all materials. Although Eagle's expert, Mr. Fischer, admitted that perhaps the Simmons patent could control a sand classifying tank he went on to state:

"Well, you would have to have a tank that—I am assuming that the scalping tank has the valve arrangements you were thinking of, electrically operated valves. But, you would have to add, you would also have to be sure that you had a sensing switch in the tank at each station. You would also have to get some timers.

"There is no provision in the Simmons patent for the timers that you would need. The type of timers that you would need. So you would have to get those.

"Then this device, I am sure, someway or other that in time you could make it work. Now, what I mean by that is that you could not make it decide how to operate the tank, but you could make the electrical connections through this device. It would be sort of a ridiculous use of it because there are something like 25 decision units.

"Then, of course, the big thing, the Simmons patent would not tell you, it would not tell you what you wanted to do because the Simmons patent is not related in any way to any scalping tank or any sand classifying tank. *It is not related in any way to the timing and the obtaining of two products.*

"The Simmons patent, you might just as well say that you could do this with electrical control circuits because that is all really the Simmons patent is, a bunch of electrical circuits. But, there are hundreds of other circuits you could use too. It sheds no light really on the problem." (Emphasis added.)

Finally, the Martin patent was not actually admitted into evidence because McLanahan failed to give Eagle the required notice of its intention to offer it, but testimony concerning it was accepted under Rule 43(c).[11] This patent is on a

(d) the invention was first patented or caused to be patented by the applicant or his legal representatives or assigns in a foreign country prior to the date of the application for patent in this country on an application filed more than twelve months before the filing of the application in the United States, or

(e) the invention was described in a patent granted on an application for patent by another filed in the United States before the invention thereof by the applicant for patent, or * * *."

9. 383 U.S. 1, 17, 86 S.Ct. 684, 15 L.Ed.2d 545, *supra.*

10. In fact, there is no time measurement. Eagle's expert, Mr. Fischer, testified that the Lovette patent did not have a timing mechanism to measure the amount of discharge. Transcript, pp. 785–86a. Mr. McCorkel, McLanahan's expert, was unable to determine whether the Lovette patent had timers. He stated only that in the Lovette patent measurement was a function of the size of the opening of the valve. Transcript, p. 754, pp. 765–68.

11. Federal Rule of Civil Procedure 43(c) provides:

"(c) Record of Excluded Evidence. In an action tried by a jury, if an objection to a question propounded to a witness is sustained by the court, the examining attorney may make a specific offer of

system for separating coal from slag and rock. It does use a sensing device and a valve system to release the coal. Importantly, however, it does not measure cumulative periods of time of discharge as does the Cochran system.

As stated previously, the essential feature of the Cochran invention was that it cumulatively measured the output of sand of different sizes from each of several discharge stations and closed the valves when the predetermined amount had been discharged thereby preventing non-specification build-ups. Because if incorporated a cumulative timing system, it was able to deal with varying inputs into the scalping tank. None of the three patents—Lovette, Simmons and Martin—introduced by McLanahan described a system that suggested or could accomplish this.

The opinion of the District Judge discloses that he considered (1) the scope and content of the prior art and (2) the differences between it and the patent in question substantially in conformity with the foregoing discussion. He analyzed the function of each of the three patents and how they differed in important aspects from the Cochran invention. Specifically, he observed:

> "The Saxe and Nielson patents were considered by the Patent Office. The Lovette patent discloses a mixing apparatus for a sand and gravel aggregate plant. However, it lacks timing or other means for the measurement of flow. Likewise, the Simmons patent does not utilize timing or other means to measure materials flowing at indeterminate intervals. The Martin patent lacks the cumulative timing devices of the Cochran patent. We are not satisfied that either Martin or Simmons, or Lovette constitute part of the prior art of the Cochran patent."

Thus, the District Judge satisfied the first and second criteria established in Graham v. John Deere Co.

As to the third criterion in *Graham*—the resolution of "the level of ordinary skill in the pertinent art"—McLanahan argues that the District Judge failed to meet that requirement. Thus the question is raised whether the District Judge found non obviousness of the Cochran patent from his own evaluation of the prior art rather than by determining it against the background of the level of ordinary skill in the art as prescribed in section 103.

At the trial McLanahan offered its engineer, Joseph G. Rigby, Jr. as a worker skilled in the art. He testified as to his familiarity with the prior art and the subject patent. He described the manner in which the scalping and sand classifying machines operated before and after the development of the AUTOSPEC and CARDOMATIC systems and to his contribution to the latter. Roy F. Rumbaugh, McLanahan's sales manager, also testified regarding the development of its CARDOMATIC system. Both witnesses were conceded to be skilled in the art.

Similarly, Eagle offered three witnesses—Weldon Arden Thalacker, its sales engineer; Robert B. Keeney, its engineer and Clement B. Cochran, its chief engineer and the inventor, all of whom described the state of the art before and after the Cochran invention. Additionally, expert witnesses for each of the respective parties—Don A. Fischer for Eagle, and Franklyn M. McCorkle for McLanahan [12]—gave their opinions as to whether a worker skilled

what he expects to prove by the answer of the witness. The court may require the offer to be made out of the hearing of the jury. The court may add such other or further statement as clearly shows the character of the evidence, the form in which it was offered, the objection made, and the ruling thereon. In actions tried without a jury the same procedure may be followed, except that the court upon request shall take and report the evidence in full, unless it clearly appears that the evidence is not admissible on any ground or that the witness is privileged."

12. Among Mr. Fischer's qualifications are a degree of Bachelor of Science in electrical engineering and a degree of Bachelor of Laws. At Washington University he served in the following capacities: as an instructor and associate professor in electrical engineering; as an associate professor in industrial engineering; as a

in the art would have found the Cochran invention obvious at the time it was conceived. Not unexpectedly, their testimony is in direct conflict.[13] While no

professor in engineering science; as the head of the Department of Industrial Engineering and as the Dean of the School of Engineering. Also he was employed as an engineer and as a patent attorney.

Among Mr. McCorkle's qualifications are a Bachelor of Science degree in economics and President of the Aggregate Equipment Company, which performs essentially the same operations as the litigants. He has had extensive sales experience with water scalping and sand classifying machines.

13. Below, in comparative columns, are pertinent excerpts from opinions of the experts:

By Mr. Pattison (McLanahan's counsel)

Q. Mr. McCorkel, in your opinion does the Cochran Patent, Plaintiff's Exhibit 1, disclose or claim any subject matter which as a whole would not have been obvious to a person skilled in the art in mid 1959?

A. No sir.

Q. Mr. McCorkel on what do you base that opinion?

A. There existed at that time a number of patents covering the same material. [The witness then analyzed and compared the following patents: Lovette, Simmons and Martin.] Transcript, p. 710.

\* \* \* \* \*

Q. Now, Mr. McCorkel in respect to your summation and evaluation of this prior art, what you personally knew of the state of the art to be from your own experience in 1959, would you state what, if any, difference in the functional operation was attained by any one given component in the Cochran control system from the function which that component was known to otherwise individually and independently perform?

A. I know of none. I mean, we speak of 1959, as though it were 1930 or 1920. We had sputniks orbiting the earth. We had satellites. We had re-entry. We had timing devices on these satellites, remote control systems. We had computers.

A pinball machine that we used when I was in high school is a more sophisticated electrical control system than the device we are discussing, than the device in the Cochran patent.

There are more sophisticated devices involved, I mean, if you are asking if this is an obvious development, it is not the obvious it was almost overdue. It was actually—excuse me.

If we look at the tanks as we have observed them, we put multiple ports in. The arrangement had been successfully worked out and all we had to do was put interrelated timing circuits which, as I say, a pinball machine has in it, and he had the Cochran patent. Transcript, pp. 742–43.

By Mr. Dorn (Eagle's counsel)

Q. Dean Fischer, in your opinion would the Cochran invention have been obvious to a man of normal skill in the art at the time it was made, based on the evidence that you have heard at this trial?

\* \* \* \* \*

THE WITNESS: In my opinion, it would not have been obvious. I say that because in all control systems which I have seen cited, and I have been over them very carefully, there is no suggestion of a control system that is similar in any way to the Cochran control system. This is from an electrical standpoint.

Also, in the art that I saw and in the testimony that I heard, I heard no reference or I have seen nothing in the patents that indicate the concept that Cochran had of having this river of sand coming along a flume and letting it gather at stations, and then in order to conserve sand, to have two products, and a waste valve there, and to gather as much as they could for the first product. When something is left over, use it for the second product without wasting it. Then measuring that by determining how much material goes through the valve and accumulating this all on the timer.

I have seen no suggestion or anything like that, and I think as far as I am concerned, it would not have been obvious to a control man. I do not believe it would be obvious to sand and gravel people. Transcript, pp. 797–98.

specific statement was adduced from any witness as to the level of skill of the art in 1959, the time of the invention, the general testimony of each witness amply manifested his knowledge of, and familiarity with, the state of the art at the time in question.

In his opinion the District Judge noted the testimony of the various witnesses above mentioned making him aware of the level of skill in the art described by them. It is true that in his opinion he followed a listing of the witnesses with the comment: "None of the witnesses was totally disinterested. The testimony of each party's witnesses supported its interest." [14] This observation merely indicated that the District Judge was weighing the credibility of the witnesses, as was his province, and in no measure can be said to be an outright rejection of all of the testimony regarding the level of skill in the art. It is obvious that the District Judge in fact accredited Eagle's expert, Mr. Fischer, more heavily than McLanahan's expert, Mr. McCorkel.

The testimony to which we have adverted made quite clear the level of skill in the art. Any suggestion that the District Judge ignored it and determined the unobviousness of the Cochran patent solely from his own evaluation of the prior art, is far from convincing in the light of his specific reference to the issue of obviousness and his recital of witnesses in connection therewith. We are persuaded that in determining that the Cochran patent was not obvious he did so with the level of skill in the art as a background.

The thorough and exhaustive opinion of the District Judge demonstrated a comprehensive exposition of all of the issues presented. His particularization of section 103 and his frequent references to the issue of obviousness in his opinion show that he was completely aware of McLanahan's defense based thereon and leave unsubstantiated its charge that he directed his decision to section 102 rather than section 103. Although his reference to Graham's third criterion regarding the level of skill in the art and the necessity for determining obviousness in the prior art against a background of its resolution was sparse, a reading of the entire opinion reinforces the conviction that there was a full compliance with all criteria of Graham.

██ McLanahan's assertion that it found it a simple matter to duplicate the system is not a conclusive test of obviousness. Even if this suggests that the Cochran patent was simple, the simplicity of an invention is not a necessary bar to a patent.[15] Similarly, that Mr. Cochran used devices already known, such as timers, does not invalidate his invention as long as he put them together in a manner heretofore unknown which was not obvious.[16] The fact remains that Mr. Cochran was the first to develop a system which apparently solved many of the problems plaguing the efficient control of scalping tanks.[17]

 The burden of proving invalidity is a heavy one,[18] and McLanahan, on whom it rested,[19] failed to meet this difficult task. We conclude that the District Judge's decision as to the non-ob-

14. Appendix, p. 87.

15. Blish, Mize and Silliman Hdwe Co. v. Time Saver Tools, Inc., 236 F.2d 913, 916 (10 Cir. 1956).

16. See United States v. Adams, 383 U.S. 39, 50, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966); Gilbert Spruance Co. v. Ellis-Foster Co., 114 F.2d 771, 773 (3 Cir. 1940).

17. It is recognized that factors such as a long felt need in the industry and commercial success are usually regarded as

secondary considerations suggesting non-obviousness. Continental Can Company v. Crown Cork & Seal Company, 415 F.2d 601, 602 (3 Cir. 1969). They do, nevertheless, have relevancy. Graham v. John Deere Co., 383 U.S. at 18, 86 S.Ct. 684.

18. Radio Corp. of America v. Radio Engineering Laboratories Inc., 293 U.S. 1 at pp. 7–8, 54 S.Ct. 752, 78 L.Ed. 1453 (1934).

19. See n. 5, supra.

viousness of the Cochran invention was sufficient in both law and fact.

### Defenses Arising Out of Certificate of Correction

McLanahan contends that a Certificate of Correction issued to Eagle on March 1, 1966 rendered the patent unenforceable against it for three reasons, viz., that it enlarged the scope of certain of the patent claims; that McLanahan had acquired intervening rights by its sale of equipment incorporating the control system alleged to have infringed Claims 1 and 3 of the Cochran patent 3,160,321, as amended by the Certificate of Correction, more than a year prior to the application for the Certificate, and that the Patent Office was induced to issue it by the exercise of bad faith. The Certificate authorized the deletion of the word "first" from Claims 1 and 3 which McLanahan contends changed the system from a sequential to a simultaneous operation.[20] It is argued that prior to the Certificate the claims mentioned provided that the second product valve would not open until the first product valve "timed out." Since the system developed by McLanahan operates simultaneously, it is its position that prior to the issuance of the Certificate McLanahan did not infringe the patent.

The Certificate of Correction was issued pursuant to 35 U.S.C. § 255 which in pertinent part provides:

"Whenever a mistake of a clerical or typographical nature, or of a minor character, which was not the fault of the Patent Office, appears in a patent and a showing has been made that such mistake occurred in good faith, the Commissioner may * * * issue a certificate of correction, if the correction does not involve such changes in the patent as would constitute new matter or would require re-examination. Such patent, together with the certificate, shall have the same effect and operation in law on the trial of actions for causes thereafter arising as if the same had been originally issued in such corrected form."

The statute permits a minor error, when made in good faith, to be corrected. In effect, the correction is given retroactive application in order that intervening rights may not be alleged. It does not constitute a reissuance of the patent and does not authorize a broadening of claims. Where there is a change altering the scope of a patent, 35 U.S.C. § 252, regulating reissued patents, controls and under it intervening rights may be achieved.[21]

20. Claim 1 originally read as follows:
"1. A control system for a water scalping tank or like classifying apparatus for granular material having a series of outlet stations each including first, second, and third outlets, said control system comprising: a first, a second, and a third series of outlet operating means, one of each for each outlet station, for opening and closing said first, second and third outlets, respectively; a first and second series of timing means individually connected to the first and second outlet operating means, respectively, at the respective outlet stations, for measuring the discharge time of material through the respective ones of said first and second outlets, each of said timing means being actuable from a first operating condition to a second operating condition, upon discharge of a predetermined amount of material through the associated one of said *first* outlets, actuation of each timing means being effec-

tive to close the corresponding outlet at each station and divert subsequent discharge to the other outlets at the same station; and means, connected to the third series of outlet operating means, for preventing discharge through any of said third outlets except when both the first and second outlets at the same station have been closed by the associated timing means." (Emphasis supplied.)
The Certificate of Correction deleted the word "first" italicized above. Claim 3 had a corresponding expression using the word "first." The same correction was made in Claim 6, not involved in this litigation. Similarly, an irrelevant correction was permitted in Claim 18.

21. 35 U.S.C. § 252 provides:
"The surrender of the original patent shall take effect upon the issue of the reissued patent, and every reissued patent shall have the same effect and operation in law, on the trial of actions for

McLanahan insists that the Certificate of Correction was the equivalent of a reissuance of the Cochran Patent since it did not simply change a minor error but substantially changed the manner in which the system functioned. It asserts that before the Certificate of Correction the Cochran Patent envisioned a two product one waste system which was designed to operate by presetting the second product valve to zero and diverting material to waste until the predetermined amount was discharged at the first product valve. When it "timed out" the second product valve would then operate.

Eagle, on the other hand, urges that McLanahan's interpretation is without foundation because it would require each timer preset at zero to measure a discharge which could not occur because the zero setting would prevent the timer from allowing a discharge. It argues that the zero-setting theory was conceived by McLanahan's taking out of context statements made to the Patent Office by Eagle.[22] Eagle adds that it made no misrepresentation in requesting the Patent Office to permit the correction of its minor error.

Both the Patent Office and the District Judge agreed with Eagle that the deletion of the word "first" in Claims 1 and 3 was a minor correction which only clarified the obviously intended simultaneous operation of the invention.[23]

---

causes thereafter arising, as if the same had been originally granted in such amended form, but in so far as the claims of the original and reissued patents are identical, such surrenders shall not affect any action pending nor abate any cause of action then existing and the reissued patent, to the extent that its claims are identical with the original patent, shall constitute a continuation thereof and have the effect continuously from the date of the original patent.

"No reissued patent shall abridge or affect the right of any person or his successors in business who made, purchased or used prior to the grant of a reissue anything patented by the reissued patent, to continue the use of, or sell to others to be used or sold, the specific thing so made, purchased or used, unless the making, using or selling of such thing infringes a valid claim of the reissued patent which was in the original patent. The court before which such matter is in question may provide for the continued manufacture, use or sale of the thing being made, purchased or used as specified, or for the manufacture, use or sale of which substantial preparation was made before the grant of the reissue, and it may also provide for the continued practice of any process patented by the reissue, practiced, or for the practice of which substantial preparation was made, prior to the grant of the reissue, to the extent and under such terms as the court deems equitable for the protection of investments made or business commenced before the grant of the reissue."

22. In a letter of July 21, 1965, by McLanahan's counsel to Eagle's counsel denying infringement, it was stated:

"Claim 3 requires that each product recycle in response to an operating condition of another product. Again the apparatus of McLanahan does not incorporate this operational feature or structure. * * *"

However, as asserted by Eagle, McLanahan made no reference to the use of the word "first" as limiting the patent to a sequential operation. Indeed, McLanahan's conception of its "zero-setting" theory appears to have been realized only after it was raised by Eagle in a completely different context in response to a charge on August 23, 1962, by the Patent Office of indefiniteness of several of the claims in its original application, Serial No. 140,941. In that response Eagle stated with particular regard to Claim 1 of that application (which became Claim 17 in the issued Patent No. 3,160,321) that:

"In this regard it should be noted that it would be readily apparent to any one of normal skill in the art that the system could be converted to operation on the basis of only two series of outlets merely by adjusting all of the timers or other measuring devices of one series of specification outlets to a zero pre-set level, in which case the remaining series of outlets would afford the sole control for diversion to the auxiliary waste outlets." Appendix, p. 285.

Nothing in that statement discloses Eagle as limiting the claim to a sequential operation only.

23. The Patent Office stated:

"The corrections are of such a minor character that they would not materially

That the Patent Office was aware of the alternative theory offered by McLanahan is apparent from McLanahan's attempt to block the issuance of the Certificate by its letter contesting Eagle's application for the Certificate.[24]

An examination of the record confirms the opinion of the Patent Office and the District Judge that the Certificate of Correction was validly issued. Mr. Fischer's testimony makes it clear that McLanahan's reading of the claims prior to their correction is contrived.[25]

McLanahan vehemently asserts that Mr. Cochran conceded that the uncorrected claims limited the invention to a

---

affect the scope or meaning of the patent and would not constitute new matter or require re-examination."

The District Judge held that:

"Defendant urges that the deletion of the word 'first' substantially altered the claims of the Cochran patent. From our examination of the language of the claims and the evidence presented regarding its interpretation, we are satisfied that the argument bears no merit. The correction was properly allowed under the terms of 35 U.S.C. § 255."

24. The body of the letter written by McLanahan's attorneys to the Patent Office on October 6, 1965 reads:

"This is written on behalf of McLanahan Corporation of Hollidaysburg, Pennsylvania, which corporation has been charged with infringement of the above-referenced patent by Eagle Iron Works, Des Moines, Iowa, and particularly with infringement of Claims 1, 2, 3, 15 and 16 of said patent.

"McLanahan Corporation is advised and therefore believes that it is the intention of Eagle Iron Works or the patentee, to seek a Certificate of Correction under the provisions of Rule 232 by which the word 'first' would be deleted or stricken from column 21, line 10 (claim 1), and from column 21, line 24 (claim 3), on the basis of an alleged error on the part of the applicant.

"Counsel for McLanahan Corporation is of the opinion that claims 1 and 3 as issued are accurately descriptive of apparatus disclosed or suggested in the patent, and of apparatus manufactured by the assignee, Eagle Iron Works. To permit correction of the claims by deletion as above suggested would substantially alter and broaden the scope found allowable by examination, and the broadening of the scope of any claims of the subject patent would arbitrarily prejudice the rights and interests of the McLanahan Corporation in view of the infringement charge which has been made under the patent.

"McLanahan Corporation respectfully requests that the Commissioner require that any broadening of the scope of any claims of U. S. Patent No. 3,160,321 be properly accomplished by reissue thereof."

25. On cross-examination Mr. Fischer testified:

"Q. * * * regarding the insertion of the word, 'first * * * would it lend any support to an interpretation of the claim, assuming that the operating condition of the apparatus or the control system was such that all of the valves for the second product in each station was preset at zero?

"A. Well, I have tried to read the claim with the 'first' in it. Before the Certificate of Correction issued, the way the claim appeared, and I could not find anywhere that it made sense, as far as I am concerned.

"Q. So, therefore, it would be your testimony that it would not make sense, even assuming that the apparatus was programmed so that all of the second product valves in the tank were preset at zero?

"A. Now, we are using the Cochran patent?

"Q. Yes, sir.

"A. And we are setting the second valve timers to zero, and they are closed.

Now, you are asking if it would read—well, you have a first and second series of timers. Each of the timing means are actuatable from a first operating condition to a second, upon discharge of the predetermined amount of material through the associated one of said first outlets.

It still does not make sense to me, because you do not have—there is an associated—I go back to the word 'associated.' I am sorry, but it says that the timers are associated with these outlets. I do not see how you can have it go back to all to the first.

The second timer, for instance? How is it going to be responsible to its associated outlet which would be the second? Then you put the word 'first' in, so I still do not make any sense out of it." Transcript, pp. 568–69.

The District Judge also relied on Mr. Fischer's testimony in his conclusion that McLanahan's "zero-setting" theory was unsatisfactory. Appendix, p. 91.

sequential operation. A review of the cross-examination of Mr. Cochran, however, fails to support so restricted an interpretation of his testimony.[26] It is true that he conceded that it is possible to operate the system by presetting one group of timers at zero thereby performing a one product operation and this was in no wise denied by Eagle at any time during the litigation. However, such concession does not derogate from Mr. Cochran's positive testimony that a sequential operation was never intended or from Eagle's position that the advantages of the patent resided in the concept of a simultaneous operation.

Additional support for the argument that the machine was not intended to operate only sequentially is found in the fact that there is an absence of evidence suggesting that Eagle constructed a machine where the second product responds only to the timer of the first product. When the original Claims 1 and 3 are read in conjunction with the remaining claims and specifications, it is clear that it was never intended to describe only an operation in which one set of timers was fixed at zero. The logical reading of the claims as a whole reveals that they describe that which *could* operate as a single product system but that they also describe that which was primarily designed to function as a simultaneous two product system.

26. On cross-examination by McLanahan's attorney, Mr. Cochran testified:
"Q. Mr. Cochran, on direct examination I believe you indicated that possibly one of several programs or operations of the Auto-spec apparatus, where we have two product outlets, would include the setting of all the second product valves at zero to convert the unit to a single product operation; is that correct?
"A. This could be done.
* * * * *
"Q. Now, Mr. Cochran, as a matter of fact, it was that very possible programming or operation of the Auto-spec which was defined by Claim 1 of your patent as at issue before it was corrected; isn't that correct?
* * * * *
"A. Actually, such an operation was never contemplated.
* * * * *
I would not interpret it as meaning that.
"Q. You would not interpret it as meaning that that was the function—
"A. That type of operation; no.
"Q. Then I would ask you at this particular stage, Mr. Cochran, if that is not a possible interpretation of that claim?
"A. Again, I would say that I would not interpret it that way, and not from the way it is stated.
"Q. Well, would you explain to me then what is meant in that particular claim where it speaks of each timing means being actuated from a first operating condition to a second operating condition upon discharge of a predetermined amount of material through the associated one of said first outlets, when the claim itself calls for in the preamble and in the opening introduction calls for their outlets?
"A. I would answer you this way: That the second product does not respond to the timers of the first product and, actually, in my estimation, it was more or less meaningless and was an error.
* * * * *
"Q. Now, Mr. Cochran, the language is as follows, and I quote: 'In this regard, it should be noted that it would be readily apparent to anyone of normal skill in the art that the system could be converted to operation on the basis of only two series of outlets merely by adjusting all of the timers or other measuring devices of one series of specification outlets to a zero preset level, in which case the remaining series of outlets would afford the sole control for diversion to the auxiliary waste outlets.'
Now, does this not describe what you have described insofar as setting some of the second product valves at zero to produce a single product operation?
"A. I do not get your meaning. I do not get your question, really, sir.
"Q. Does not what I have just quoted or read to you define or describe or suggest the operation?
"A. Yes, I would say that it suggests zeroing out one set of timers; yes.
"Q. And, therefore, as called for in the claim, you would divert to waste or to your auxiliary outlet after a predetermined discharge from the first product, would you not?
"A. Yes, this would happen." Transcript, pp. 197–202.

■ Since it is our conclusion that the District Judge correctly held that the Certificate of Correction did not change the scope of the patent and that it was validly issued pursuant to the statute, McLanahan's contention that it achieved intervening rights and its charge of bad faith on Eagle's part in dealing with the Patent Office in connection with its application for the Certificate of Correction must fall.

For the foregoing reasons the final judgment and order of the United States District Court for the Western District of Pennsylvania of February 27, 1969 adjudicating that the United States Letters Patent No. 3, 160, 321 is valid; that McLanahan infringed Claims 1, 2, 3, 15 and 16; that the Certificate of Correction was validly issued; that Eagle is entitled to a permanent injunction enjoining further infringement, an accounting for past infringement, costs, but not attorney's fees as provided therein, and the denial of McLanahan's counterclaim,[27] will be affirmed.

SEITZ, Circuit Judge (dissenting).

The majority adopts the district court's conclusion that the defendant failed to carry its burden of proving the Cochran invention was invalid because it was "obvious." 35 U.S.C. § 103. The essential contribution of the Cochran invention to the existing plan of the water scalping sand classifying tank was the replacement of manually set valves with valves controlled by cumulative electric timers. The Cochran system thus made the tank more capable of producing a uniform final product. However, this result was accomplished by utilizing electric timers, which had long been commercially available, and having them perform functions substantially similar to those which they discharged in other fields. Thus, I believe the district court

erred in concluding that the Cochran invention would not have been obvious to one having ordinary skill in the pertinent art at the time the invention was made.

---

27. McLanahan filed a counterclaim charging Eagle with unfair competition and violation of the antitrust laws in conjunction with matters pertaining to the patent. The allegations were denied by Eagle and there was no evidence adduced at trial in support of the claim and it was therefore dismissed by the District Judge. It was not raised on this appeal.