INJECT-O-METER MANUFACTURING COMPANY, Inc., Plaintiff-Appellant,

v.

NORTH PLAINS FERTILIZER AND CHEMICAL, INC., Defendant-Appellee.

No. 29362.

United States Court of Appeals, Fifth Circuit.

March 3, 1971.

Rehearing Denied March 31, 1971.

Elsie Brown Silverman, Ely Silverman, Amarillo, Tex., for appellant.

Hugh T. Lyle, Dumas, Tex., Joe E. Edwards, A. H. Evans, Houston, Tex., for appellee.

Before GEWIN, MORGAN and ADAMS [*], Circuit Judges.

GEWIN, Circuit Judge.

The subject of this patent appeal is liquid fertilizer. Appellant, Inject-O-Meter Manufacturing Co. (IOM) is the owner [1] of patents for an apparatus (U. S. Patent No. 3,326,232, June 30, 1967 hereinafter apparatus 232 patent) and a related process (U.S. Patent No. 3,375,976, April 2, 1968, hereinafter process 976 patent) for injecting liquid fertilizer into a crop irrigation system. (Appendix, figure 1) Appellee, North Plains Fertilizer and Chemical Co. (Norpak) has developed and marketed an unpatented device for the same purpose. (Appendix, figure 2) IOM has alleged infringement of both patents by Norpak; Norpak has in turn counterclaimed seeking a declaration that both patents are invalid. On motion for summary judgment the district court found no infringement of either patent and declared the process 976 patent invalid, 308 F. Supp. 538. We affirm.[2]

I

*The Process 976 Patent*

The court below declared this patent both invalid and not infringed.

---

[*] Of the Third Circuit, sitting by designation.

1. The co-patentees of the patents in question are Otis C. Stamps and David W. Neikirk who assigned them to the appellant.

2. In considering this case we are fully aware of the dangers of indiscriminate use of summary judgment in patent cases as well as others. Ag Pro, Inc. v. Sakraida, 437 F.2d 99 (5th Cir. 1971) [February 1, 1971]. However, it is our view that the evidence in this case was fully and adequately developed and that summary judgment was appropriate under the facts and in the circumstances present. Method

Electronics, Inc. v. Elco Corp., 385 F.2d 138 (3d Cir. 1967); Ballantyne Instruments & Electronics, Inc. v. Wagner, 345 F.2d 671, 672 (6th Cir. 1965); Ronel Corp. v. Anchor Lock of Fla., Inc., 325 F.2d 889, 890 (5th Cir. 1963), cert. denied 377 U.S. 924, 84 S.Ct. 1221, 12 L.Ed.2d 216 (1964). See also footnotes 21 and 23 *infra* and accompanying text. The court considered the case "upon completion of discovery", and after considering the arguments of counsel, the pleadings, answers to interrogatories, depositions, and briefs on file. We have before us the complete record as well as an appendix which contains over 500 pages.

In accordance with the mandate of this court and the Supreme Court, we deem it appropriate, in light of the Constitution[3] and public policy[4] to consider first the issue of validity.[5] Our resolution of that issue obviates inquiry into infringement.

It is now well established that there are three statutory and constitutional requirements for a valid patent: utility, novelty, and non-obviousness.[6] The utility of IOM's device is not disputed. The court below chose to invalidate the process patent on the second of the listed grounds under 35 U.S.C. § 102(b), i. e., that:

"the invention was * * * described in a printed publication

* * * more than one year prior to the date of the application for patent in the United States."

Although we do not choose to hold this finding of the district court erroneous, we note that there is some possible ambiguity in the language of the prior printed publication which the district court concluded was a disclosure of IOM's process.[7] Keeping in mind the requirement that the prior description must be "in such full, clear, and exact terms as to enable any person skilled in the art to which it relates to practice the invention,"[8] we are constrained to articulate an additional ground for holding the 976 patent invalid—that of obviousness.

3. "The Congress shall have the Power * * "To promote the Progress of Science and Useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries;"
U.S.Const. Art. I, § 8

4. "The grant of an exclusive right to an invention was the creation of society—at odds with the inherent free nature of disclosed ideas—and was not to be freely given. Only inventions and discoveries which furthered human knowledge, and were new and useful, justified the special inducement of a limited private monopoly."
Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). See also Sinclair & Carroll Co., Inc. v. Interchemical Corp., 325 U.S. 327, 65 S.Ct. 1143, 89 L.Ed. 1644 (1945); Anderson's Black Rock v. Pavement Salvage Co., 396 U.S. 57, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969); Beckman Instruments, Inc. v. Chemtronics, Inc., 428 F.2d 555 (5th Cir. 1970).

5. Id.

6. Graham v. John Deere, Inc., 383 U.S. 1, 86 S.Ct. 684 (1966); Beckman v. Chemtronics, Inc., 428 F.2d 555 (5th Cir. 1970); Swofford v. B & W Inc., 395 F.2d 362 (5th Cir. 1968).

7. The publication, Harrison, Injection of Liquid Fertilizer Materials into Irrigation Systems, University of Florida Agricultural Extension Service, Circular 276 (1965) was published well over a year before appellant's application for the process patent. The important language is:
At least three companies manufacture injection units which introduce fertilizer

directly into the irrigation discharge line. These units, complete with tank, utilize a pressure difference in the *line*— usually between couplers, around elbow, at a reducer, or a special venturi—to force the fertilizer solution into the main line discharge pipe. (p. 6) (emphasis added).
It may be argued that the word "line" as it appears in the second sentence above does not refer to the same "line" as used in the first sentence. If the word "line" as used in the second sentence refers to the line in the fertilizer injecting apparatus (see figure 1), the circular clearly speaks of the same process which appellant claims in his patent. On the other hand, if the reference is to the main discharge line (see figure 1), then it may be argued that the process described may not be sufficiently similar to IOM's process 976 patent to anticipate it. Even if it is arguable that an ambiguity does exist, it is not necessary for us to disturb the conclusion of the district court on this issue.

8. Strong v. General Electric Co., 434 F.2d 1042 (5th Cir. 1970) [December 8, 1970] slip opinion at 8; Rich Products Corp. v. Mitchell Foods, Inc., 357 F.2d 176 (2d Cir. 1960), cert. den. 385 U.S. 821, 87 S.Ct. 46, 17 L.Ed.2d 58; Bros., Inc. v. W. E. Grace Mfg. Co., 351 F.2d 208, 212 (5th Cir. 1965), cert. den. 383 U.S. 936, 86 S.Ct. 1065, 15 L.Ed.2d 852; Ballantyne Instruments & Electronics, Inc. v. Wagner, 345 F.2d 671 (6th Cir. 1965), aff'd. per curiam after remand 386 F.2d 789, cert. den. 390 U.S. 1026, 88 S.Ct. 1413, 20 L.Ed.2d 283; Deller's Walker on Patents, § 60 (2d Ed. 1964).

Section 103 of Title 35 is the statutory basis of the non-obviousness requirement:

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

This statute was intended as a codification of the judicially adopted requirement of "invention" with special congressional instruction to approach the problem by inquiring into the obviousness of the subject matter sought to be patented.[9] Thus, like "invention", "obviousness" is a word of art incapable of an exact definition appropriate in all circumstances.

What is obvious is not a question upon which there is likely to be uniformity of thought in every given factual context. The difficulties, however, are comparable to those encountered daily by the courts in such frames of reference as negligence and scienter, and should be amenable to a case-by-case development.[10]

Accordingly, the issue of obviousness is a question of law[11] to be determined after examination of the following factual considerations:

the scope and content of the prior art * * * ; differences between the prior art and the claims at issue * * * ; and the level of ordinary skill in the pertinent art.[12]

(a) *The Prior Art.* Our examination of the prior art need go no further than a 1965 publication by the University of Florida Agricultural Extension Service.[13] That pamphlet contains a collection of brief descriptions of methods for injecting liquid fertilizer into irrigation lines. One of the methods described is shown in the diagram reproduced in the Appendix as figure 3. This process simply calls for the fertilizer to be pumped from a storage tank into the main discharge line at a point somewhere between the irrigation pump and the sprinklers. Relevant parts of the descriptive text are copied below.[14] Note

9. Graham v. John Deere Co., 383 U.S. 1, 17, 86 S.Ct. 684 (1966); Hotchkiss v. Greenwood, 52 U.S. (11 How.) 248, 13 L.Ed. 683 (1850).

10. Graham v. John Deere Co., 383 U.S. 1, 18, 86 S.Ct. 684, 694 (1966).

11. Id.; Beckman Instruments, Inc. v. Chemtronics, Inc., 428 F.2d 555 (5th Cir. 1970); Swofford v. B & W, Inc., 395 F.2d 362 (5th Cir. 1968).

12. Graham v. John Deere Co., 383 U.S. 1, 17, 86 S.Ct. 684, 694 (1966).

13. See note 7 *supra.* The Harrison publication was not before the Patent Office when the patents in question were issued. The district court found:

Furthermore, the presumption, under 35 United States Code § 282, that a patent is valid is weakened when, as in this case, the most pertinent prior art is not examined by the patent office in deciding to issue the patent. Nossen and Nossen Laboratories, Inc. v. United States, 189 Ct.Cl. 1, 416 F.2d 1362

(1969). In this instance, the Harrison Publication which presents a very pertinent account of the prior art was not before the patent office examiners when the decision to issue the process patent was made.

14. Deep Well Pumps (Method No. 1): * * * A common method, especially adapted where electric power is available, is to use a small rotary, gear or piston pump to inject the solution into the discharge line. The fertilizer injector pump must be able to deliver a higher pressure than that coming from the main irrigation pumping plant, but at relatively low rates. It may be driven by electric or air cooled motor.

One of the most popular methods, where an auxiliary motor is not desired, is to mount a jack-shaft to the main irrigation power unit. The fertilizer injection pump is then driven by the power-take-off shaft and a separate clutch is installed. Several of these units are now operating in the state. The advantage of such an ar-

that the diagram shows a manually operated "cut-off valve" on the injection line between the fertilizer pump and the main discharge line. The author of this circular testified by deposition that this valve served the obvious function of preventing irrigation water from siphoning back into the fertilizer tank when the fertilizer pump was not in operation.

(b) *Appellant's Process.* IOM's patent prescribes an improved process for implementing the prior art described above by making the level of application of fertilizer more easily regulatable and uniform despite fluctuations in the flow of water through the main discharge line.[15] To accomplish this desirable goal, Claim 1 of the patent, set out below, teaches to pressurize the liquid fertilizer, pass it through an "adjustable orifice" that will create an intentional pressure drop, and then to inject the solution into the irrigation system.[16] Claim 2 specifies that the pressure drop

is to be at least 20 pounds per square inch.[17] The final 2 claims specify the pressure variations in the irrigation line and the attributes of portability.

(c) *Difference Between Prior Art and Appellant's Process.* Practically speaking, then, the patent calls for the substitution of an adjustable "throttle valve" for the above discussed cut-off valve, and the conscious manipulation of the relationship of pressures in the injection line on either side of the throttle valve and in the irrigation line itself. As a result, a higher pressure is backed up behind the throttle valve; the fertilizer that seeps through at a lower pressure rate is said therefore to be less sensitive to pressure changes in the main line. Thus, a precise amount of fertilizer may be uniformly injected with a higher degree of certainty; and the perils of the prior art, namely uneven and spotty application of fertilizer, are significantly reduced.

rangement is elimination of an auxiliary power unit for the fertilizer injection pump. (pp. 4–5).

15. The patent states, in part:
This relationship of apparatus and process provides that the resistance provided by the control valve is a controlling factor to flow and minor variations in pressure, volume, etc. density of the irrigating waters in [the main discharge] line and minor variations in pressure in [that] line do not affect the substantially constant rate of flow of liquid notwithstanding the variations in pressure and volume that occur within the line due to the inherent characteristics of the operation of the pump and the apparatus. Further still, this constant flow from the [fertilizer injection] line to the [main discharge] line provides that there are no oscillations added to the flow pattern of the water through the [main discharge] line such as are caused by an irregular stopping and starting of flow into the [main discharge] line; rather, there is a steady flow and pressure from the [fertilizer injection] line into the [main discharge] line. (Numerical references to patent diagram omitted).

16. We claim:
1. A process for treating land with liquid fertilizer which comprises the steps of

(a) Pressurizing the liquid fertilizer and bringing it to a first, high pressure level,
(b) Passing the pressurized liquid fertilizer through an adjustable orifice at a predetermined rate and thereby lowering the pressure of said liquid to a second, lower pressure level,
(c) Concurrently raising water from below the ground at a first site and raising its pressure to a water pressure within a range having a maximum lower than the value of said second pressure level, said water pressure of said water within said range being a varying pressure,
(d) Passing the liquid fertilizer at such second, lower, level of pressure into said stream of water at said range of pressure, and mixing the liquid fertilizer and the water, and
(e) Passing the admixture to a liquid distributor located on said land at a distance from said first site and distributing said liquid fertilizer on said land.

17. 2. Process as in claim 1 wherein the pressure of said liquid fertilizer is lowered at least 20 pounds per square inch from said first to said second pressure level.

In terms of methodology, the only discernible difference between the patented process and the prior art are embodied in Claims 1(b) and 2; absent these claims the process would have been entirely disclosed by the University of Florida circular. The validity of the process hinges on these two claims. If, as a matter of law, they are inventive additions to the prior art, the patent is valid; if they fall under the obviousness test, the patent falls with them.

(d) *Obviousness.* For reasons to be discussed below it is our conclusion that the difference between these claims and the prior art "would have been obvious at the time the invention was made to a person having ordinary skill in the art."[18]

As we perceive appellant's patent, its two principal characteristics are that the flow of fertilizer is (1) precisely regulatable and (2) relatively independent of variations in the flow of water through the main line. The problems solved by these improvements were conspicuous in the prior art. To recognize them was in no way inventive. Once the first need —for a regulatable system—is recognized, the solution reached in the patent —an adjustable orifice—is readily apparent. The second need—for an injection system which is insensitive to the irrigation flow rate—manifestly depends on the interrelationship of pressure levels within the system. This, in turn, would readily suggest that the problem could be solved by experimental manipulation of the pressure levels until a satisfactory relationship of pressures was

delivered. We need go no further into detail or speculation to describe the mechanical trial and error process that would logically follow. Manipulation of the relationship of the size and speed of the pump and of the relative size of the various pipe lines to the size of the opening in the throttle valve would inevitably lead to IOM's solution. Simply by using a larger-than-necessary pump and throttling down the adjustable valve, the process of the patent could be duplicated in all of its vital elements by one of ordinary skill in the art.

In Anthony v. Ranco Inc.,[19] we considered a patent which attempted to combine a newly developed automatic valve with a system to reverse a refrigeration process to create heat. In holding that patent invalid, we used language that is appropriate here:

In spite of these and other differences which may amount to improvement over valves of the prior art, in sum all that appellant did was to apply a known valve to an analogous use in a known combination or system. This is not invention. Such advance in the art, if advance there was, merely resulted from that type of activity reasonably to be expected of those mechanically skilled in the applicable art.[20]

The process 976 patent is invalid by virtue of its obviousness. We make this determination as a matter of law based on evidence which convinces us beyond a reasonable doubt that the statutory presumption of validity of issued patents should fall.[21]

18. 35 U.S.C. § 103; Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966).

19. 316 F.2d 509 (5th Cir. 1963).

20. Id. at 512. See also Johns-Manville v. Cement Asbestos Products Co., 429 F.2d 1381 (5th Cir. 1970); Swofford v. B & W Inc., 395 F.2d 362 (5th Cir. 1968); National Filters, Inc. v. Research Products Corp., 384 F.2d 516 (5th Cir. 1967); Sisko v. Southern Resin & Fiberglass Corp., 373 F.2d 866 (5th Cir. 1967); Up-Right, Inc. v. Safeway Products, Inc., 364 F.2d 580 (5th Cir. 1966).

21. See e. g., Strong v. General Electric Co., 434 F.2d 1042 at 1043 (5th Cir. 1970) [December 8, 1970].

    In support of its contention that the patent is valid, IOM has offered evidence of the felt need for a solution to the problems raised and of the commercial success of appellant's process as a solution to the problems. This evidence is of secondary importance only; it cannot serve to raise appellant's process above the benchmark of patentability. Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684 (1966).

## II

### The Apparatus 232 Patent

Appellant also claims infringement of the parent of the 976 patent—an apparatus patent which proffers a detailed method of effectuating the 976 process. Because Norpak does not contest the validity of this patent on appeal we move to consideration of the infringement issue.[22]

Although IOM admits that Norpak is not presently infringing the apparatus 232 patent, it is their contention that Norpak manufactured infringing devices in 1966 which were in use after the issuance of the patent in June of 1967. IOM has submitted affidavits tending to show the following facts: that Norpak purchased and dismantled their device in early April of 1966; that Norpak purchased at least a dozen each of several component parts of the IOM device later in the same month; and that IOM's device is useful in normal operation for a two year period. From these facts appellant asks us to infer that their device was copied by Norpak and that it was in use in June of 1967 when the patent was issued. Norpak answers by unrefuted testimony to the effect that the component parts were purchased for experimentation only and were discarded prior to the date that appellant's patent was granted. There is no testimony offered by IOM that infringing devices were ever seen in use.[23]

On these facts the trial court found that appellant's claims were "much too speculative to raise any genuine issue of a material fact." We agree. In these circumstances it was within the court's discretion to determine that there were no facts alleged which met the requirement of showing a genuine issue for trial as provided by Fed.R.Civ. P. 56(e).

Affirmed.

See Appendix on next page.

22. Although the validity of apparatus 232 patent is not raised as an issue on this appeal, we are mindful of the criticism that there is a tendency among lower federal courts in infringement suits to dispose of them on the ground of non-infringement without going into the question of the validity of the patent. It has been clearly held that validity is of greater importance than infringement. See footnotes 4 and 5 and particularly Sinclair & Carroll Co., Inc. v. Interchemical Corp., 325 U.S. 327, 330, 65 S.Ct. 1143, 89 L.Ed. 1644 (1945). Since validity is not an issue, there is no attack on the statutory presumption of validity. 35 U.S.C. § 282; Kardulas v. Florida Mach. Prods. Co., 438 F.2d 1118 (5th Cir. 1971) [February 9, 1971]. Based on the record before us strong reasons appear to support the validity of the apparatus 232 patent. See Sterner Lighting, Inc. v. Allied Electrical Supply Co., Inc., 431 F.2d 539 (5th Cir. 1970). The patent specifies a detailed solution to the problem it was intended to solve. Construed narrowly, it appears to represent the synergistic resolution of difficult technical problems not heretofore resolved and therefore "describes a unique, nonobvious solution to a problem rather than a general idea, which might well be nonpatentable on obviousness grounds." 431 F.2d at 543. We emphasize that under this view the patent can stand only if the language of its claims is limited to the narrowest possible meaning.

23. After oral argument on motion for summary judgment, the district court stated:
At the hearing on December 16, 1969, counsel for plaintiff admitted that the device Defendant presently manufactures does not infringe Plaintiff's apparatus patent.
The district court also found:
In fact, neither Mr. Stamps nor Mr. Neikirk, co-patentees and officers of Plaintiff Corporation, ever saw an apparatus similar to their own manufactured by Defendant after April, 1966, over one year before issuance of the apparatus patent in June, 1967. (Stamps deposition of October 7, 1969, page 24 and Neikirk deposition of January 24, 1969, pages 182–187). In this regard, the law is well settled that there could be no infringement before a patent is issued. Coakwell v. United States, 178 Ct.Cl. 654, 372 F.2d 508 (1967).

APPENDIX

Figure 1. North Plains' schematic representation of Inject-O-Meter's apparatus

[A3720]

Figure 2: North Plains' schematic representation of their apparatus

[A3721]

Figure 3.   The apparatus disclosed in the prior University of Florida publication

[A3722]